IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

R & D Film 1, LLC,               )
)
)  Case No.: 13-cv-00279
Plaintiff,           )
)
v.                       )
)
DOES 1- 11,          )
)
Defendants.       )

## **DECLARATION OF DARREN M. GRIFFIN**

1.    I, Darren M. Griffin, make this declaration based on my personal knowledge. If called upon to do so, I will testify that the facts stated herein are true and correct.

2.    I have been retained by Crystal Bay Corporation ("CBC"), a corporation of South Dakota, as a software consultant in its technical department. CBC provides forensic investigation services to copyright owners.

3.    The forensic software used by CBC routinely collects, identifies and records the Internet Protocol ("IP") addresses in use by those individuals who employ the BitTorrent protocol to share, copy, reproduce and distribute copyrighted works.

4.    An IP address is a unique numerical identifier that is automatically assigned to an internet subscriber by the subscriber's Internet Service Provider ("ISP"). Using logs kept in the ordinary course of business, ISPs maintain records of the IP addresses assigned to their subscribers. Once provided with an IP address, plus the date and time of the detected and documented infringing activity, ISPs can use their subscriber logs to identify the name, address, email address, phone number and Media Access Control number of a user/subscriber.

5.     Only the ISP that has assigned a particular IP address for use by a subscriber can correlate that IP address to a specific subscriber. From time to time, a subscriber of Internet services may be assigned different IP addresses by their ISP. Thus, to correlate a subscriber to an IP address, the ISP also needs to know when the IP address was used. Unfortunately, many ISPs only retain the information necessary to correlate an IP address to a particular subscriber for a very limited period of time.

6.     Plaintiff retained CBC to identify the IP addresses of those BitTorrent users who were copying and distributing Plaintiff's copyrighted movie as identified in Exhibit A (the "Work"). CBC directed me to review, analyze and attest to the results of the investigation.

7.     During the performance of my duties as detailed below, I used forensic software provided by CBC to scan peer-to-peer networks for the presence of infringing transactions.

8.     After reviewing the evidence logs, I isolated the transactions and the IP addresses of the users responsible for copying and distributing the Work.

9.     Through each of the transactions, the computers using the IP addresses identified in Exhibit A transmitted a copy or a part of a copy of a digital media file identified by the hash value set forth in Exhibit A. The IP addresses, hash values, dates and times contained in Exhibit A correctly reflect what is contained in the evidence logs. The subscribers using the IP addresses set forth in Exhibit A were all part of a "swarm" of users who were reproducing, distributing, displaying or performing the copyrighted work identified in Exhibit A.

10.    Moreover, the users were sharing the identical copy of the Work. A

digital copy of an audiovisual work can be uniquely identified by a unique, coded, string of characters called a "hash checksum." The hash checksum is a string of alphanumeric characters generated by a mathematical algorithm known as U.S. Secure Hash Algorithm 1 or "SHA-1", which was developed by the National Security Agency and published as a U.S. government standard. Using the hash tag identified in Exhibit A, I confirmed that the users identified as Doe Defendants in Exhibit B to the complaint reproduced and distributed the same copy of the Work.

11.    The CBC software analyzed each BitTorrent "piece" distributed by each IP address listed in Exhibit A and verified that reassembling the pieces using a specialized BitTorrent client results in a fully playable digital motion picture.

12.    The software uses a geolocation functionality to confirm that all IP addresses of the users set forth in Exhibit A were located in this District and, based on information and belief, those users were specifically located in this District. Although an IP address alone does not reveal the name or contact information of the subscriber, it does reveal the location of the Internet line used for the transaction. IP addresses are distributed to ISPs by public, nonprofit organizations called Regional Internet Registries. These Registries assign blocks of IP addresses to ISPs by geographic region. In the United States, these blocks are assigned and tracked by the American Registry of Internet Numbers. Master tables correlating the IP addresses with local regions are maintained by these organizations in a publicly available and searchable format. The geographic location of an IP address can be further narrowed by cross-referencing this information with secondary sources such as data contributed to commercial databases by ISPs.

13.    As set forth in Exhibit A, I have confirmed not only that the users distributed the files in this District, but also the specific location (city/town) where the distribution took place.

14.    The targeted dates of the swarm in this matter cover a couple of months.

15.    Torrent swarms can survive over extended periods of time (months or years) and provide users with exactly the same file comprising exactly the same pieces. The term "piece" is a term of art identifying a portion of a particular file. Based on information and belief, torrent swarms for popular files have been known to be available for over 6 years. The initial seeder (of a parent file) uploads the content and then promotes the torrent file through online forums or websites. Users then have access to the torrent file over the same forums or websites and can join a link to the torrent swarm. Users receive the pieces of the initial seeder and provide those pieces to other users. The transfer occurs piece-by-piece so that the initial pieces from the seeder get passed from one user to the next user.

16.    There is no requirement to join an active swarm at a specific date and time. However, a torrent swarm might become smaller after months or years which slows down the process of file sharing activity but still renders the file fully available. A primary factor determining the size of a swarm is the popularity of the product that the file contains (movie, audio, TV series, etc.). For example, a recently released movie can lose popularity within weeks or months, whereas a famous album of a rock band might continue to be popular for several years.

17.    In terms of a common nexus of transactions and occurrences, the actions of individuals who downloaded a movie on a particular date in time are connected to the

actions of individual who later downloaded the same movie (the same file) as part of the same swarm in at least the following ways:

        a.     A file with a particular hash value downloaded by an individual over that time period can ultimately be traced to a single parent file (i.e., the actions relate back to the same initial seed of the swarm);

        b.     The swarm expands over that time period to include additional individuals based on uploading and downloading of pieces of the same file with the same hash value (i.e., the infringement by each individual further advances the series of infringements that began with the initial seed and continued through the actions of other infringers such that all individuals act under the same system); and

        c.     An individual operating a computer with BitTorrent software left "on" remains a participant of a swarm with respect to any file marked for participation in that swarm (i.e., each individual shares pieces that originated from the same (identical) file, and opens their computer to allow others to connect and receive those pieces).

## FURTHER DECLARANT SAYETH NOT.

## DECLARATION

PURSUANT TO 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24 day of May, 2013.

By: _____
Darren M. Griffin

## GRIFFIN EXHIBIT A

| B | E | G | J | K | M | O |
|---|---|---|---|---|---|---|
| IP Address | HitDateUTC (MM/DD/YY) | Title | FileHash | ISP | city | Province |
| 1 68.190.172.114 | 04/16/2013 04:42:21 AM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Charter Communications | Madison | Dane |
| 2 71.89.39.61 | 04/04/2013 02:14:55 AM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Charter Communications | Wausau | Marathon |
| 3 66.188.246.101 | 03/24/2013 03:10:44 PM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Charter Communications | Eau Claire | Eau Claire |
| 4 97.83.227.50 | 03/23/2013 06:19:56 PM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Charter Communications | Madison | Dane |
| 5 68.117.98.159 | 03/03/2013 12:54:44 AM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Charter Communications | Menomonie | Dunn |
| 6 50.50.91.45 | 02/22/2013 08:23:43 PM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Frontier Communications | Portage | Columbia |
| 7 50.123.203.120 | 02/13/2013 07:01:38 PM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Frontier Communications | Pardeeville | Columbia |
| 8 205.213.104.101 | 01/30/2013 06:15:45 PM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | WiscNet | Madison | Dane |
| 9 96.42.1.2 | 01/29/2013 04:14:53 AM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Charter Communications | Wisconsin Rapids | Wood |
| 10 71.87.126.14 | 01/26/2013 04:48:31 AM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Charter Communications | Lodi | Columbia |
| 11 66.188.109.108 | 01/21/2013 11:32:09 PM | The Divide | SHA1: 9285FB3B296FB6D8E7F35CEA75F443AC6330DC29 | Charter Communications | Oregon | Dane |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DALLAS BUYERS CLUB, LLC, | ) |
| | ) Case No.: 14-cv-7052 |
| Plaintiff, | ) |
| | ) Judge James B. Zagel |
| v. | ) |
| | ) Magistrate Judge Michael T. Mason |
| DOES 1-19, | ) |
| | ) |
| Defendants. | ) |

### DECLARATION OF DANIEL MACEK IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO RULE 26(f) CONFERENCE

1.    My name is Daniel Macek. I am over the age of 18 and am otherwise competent to make this declaration. This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

2.    I have been retained as a consultant by Crystal Bay Corporation CBC ("CBC"), a company incorporated in South Dakota and organized and existing under the laws of the United States, in its technical department. CBC is in the business of providing forensic investigation services to copyright owners.

3.    The Internet is a vast collection of interconnected computers and computer networks that communicate with each other. It allows users to freely and easily exchange ideas and information, including academic research, literary works, financial data, music, audiovisual works, graphics, and an unending and ever-changing array of other data.

4.    The Internet also affords opportunities for the wide-scale infringement of copyrighted motion pictures and other digital content.

5.    Once a motion picture has been transformed into a digital format, it can be copied further and distributed an unlimited number of times over the Internet, without significant degradation in picture or sound quality.

14-cv-7052

6.     To copy and distribute copyrighted motion pictures over the Internet, many individuals use online media distribution systems or so-called peer-to peer ("P2P") or BitTorrent networks. P2P networks, at least in their most common form, are computer systems that enable Internet users to (1) make files (including motion pictures) stored on each user's computer available for copying by other users; (2) search for files stored on other users' computers; and (3) transfer exact copies of files from one computer to another via the Internet.

7.     To use a P2P or BitTorrent distribution system requires more than a click of a button. A software installation and configuration process needs to take place.

8.     The P2P systems enable widespread distribution of digital files: each user of the system who copies a digital file from another user can then distribute the file to other users and so on, so that complete digital copies can be easily and quickly distributed thereby eliminating long download times.

9.     While Plaintiff has observed the infringement occurring on the Internet, it does not know the true identities of those individuals who are committing the infringement.

10.     Additionally, the P2P methodologies for which Crystal Bay Corporation monitored for Plaintiff's Motion Picture (Dallas Buyers Club) make even small computers with low bandwidth capable of participating in large data transfers across a P2P network. The initial file-provider intentionally elects to share a file using a P2P network. This is called "seeding." Other users ("peers") on the network connect to the seeder to download. As additional peers request the same file, each additional user becomes a part of the network (or "swarm") from which the file can be downloaded. However, unlike a traditional peer-to-peer network, each new file downloader is receiving a different piece of the data from each user who has already downloaded that piece of data, all of which pieces together comprise the whole.

11.     This means that every "node" or peer user who has a copy of the infringing copyrighted material on a P2P network can also be a source of download for that infringing file, potentially both copying and distributing the copyrighted Motion Picture. The distributed nature of P2P leads to rapid spreading of a file throughout peer users. As more peers join the swarm, the likelihood of a successful download increases. Because of the nature of a P2P protocol, any seed peer who has downloaded a file

2

14-cv-7052

prior to the time a subsequent peer downloads the same file is automatically a possible source for the subsequent peer.

12.    All infringers connected to those files are investigated through downloading a part of the file placed on their computer.

13.    This evidence is then saved on a secure server.

14.    Once the searching software program identifies an infringer in the way described herein for the Motion Picture for which Plaintiff owns the exclusive licensing and distribution rights, it automatically obtains the IP address of a user offering the file for download and saves it in a secure database.

15.    The forensic software routinely collects, identifies and records the Internet Protocol ("IP") addresses in use by those people who employ the BitTorrent protocol to share, copy, reproduce and distribute copyrighted works. In this way, the software is connected to files of illegal versions of the Motion Picture.

16.    An IP address is a unique numerical identifier that is automatically assigned to an Internet user by the user's Internet Service Provider ("ISP"). It only enables Plaintiff to trace the infringer's access to the Internet to a particular ISP. An ISP can be a telecommunications service provider such as Verizon, an Internet service provider such as America Online, a cable Internet service provider such as Comcast, or even an entity such as a university that is large enough to establish its own network and link directly to the Internet. Each time a subscriber logs on, he or she may be assigned a different (or "dynamic") IP address unless the user obtains from his/her ISP a static IP address. ISPs are assigned certain blocks or ranges of IP addresses by the Internet Assigned Numbers Authority ("IANA") or a regional internet registry such as the American Registry for Internet Numbers ("ARIN"). However, some ISPs lease or otherwise allocate certain of their IP addresses to other unrelated, intermediary ISPs. These intermediaries can be identified by the ISP, and the logs of the intermediaries will contain the subscriber information.

17.    In logs kept in the ordinary course of business, ISPs keep track of the IP addresses assigned to their subscribers. Once provided with an IP address, plus the date and time of the detected and

3

Case 1:15-cv-06708 Document #: 65-3 Filed: 10/09/14 Page 5 of 31 PageID #:45

14-cv-7052

documented infringing activity, ISPs can use their subscriber logs to identify the name, address, email address, phone number and other related information of the user/subscriber.

18.     Only the ISP to whom a particular IP address has been assigned for use by its subscribers can correlate that IP address to a particular subscriber. From time to time, a subscriber of Internet services may be assigned different IP addresses from their ISP. Thus, to correlate a subscriber with an IP address, the ISP also needs to know when the IP address was being used.

19.     Crystal Bay Corporation determined that the Doe Defendants identified in Complaint Exhibit B were using the ISPs listed in the exhibit to gain access to the Internet and distribute and make available for distribution and copying Plaintiff's copyrighted Motion Picture.

20.     It is possible for digital files to be mislabeled or corrupted; therefore, Crystal Bay Corporation (and accordingly, Plaintiff) does not rely solely on the labels and metadata attached to the files themselves to determine whether or not a particular motion picture is copied in the downloaded file, but also confirms the copying by a visual comparison of the downloaded file and the Motion Picture.

21.     As to Plaintiff's copyrighted Motion Picture, as identified in the Complaint, a member of Crystal Bay Corporation watches a DVD of the original Motion Picture.

22.     After Crystal Bay Corporation identifies the Doe Defendants and downloads the motion pictures they were distributing, Crystal Bay Corporation opens the downloaded files, watches them and confirms that they contain the Motion Picture identified in the Complaint.

23.     To identify the IP addresses of those BitTorrent users who were copying and distributing Plaintiff's copyrighted Motion, Crystal Bay Corporation's forensic software scans peer-to-peer networks for the presence of infringing transactions.

24.     After reviewing the evidence logs, I isolated the transactions and the IP addresses of the users responsible for copying and distributing the Motion Picture.

25.     Through each of the transactions, the computers using the IP addresses identified in Complaint Exhibit C transmitted a copy or a part of a copy of a digital media file of the copyrighted Motion Picture identified by the hash value set forth in Complaint Exhibit C. The IP addresses, hash values, dates

4

Case 1:14-cv-06708 Document #: 8-3 Filed: 10/09/14 Page 6 of 31 PageID #:45

14-cv-7052

and times contained in Complaint Exhibit C correctly reflect what is contained in the evidence logs. The subscribers using the IP addresses set forth in Complaint Exhibit C were all part of a single "swarm" of users who were reproducing, distributing, displaying or performing the copyrighted Motion Picture between July 5, 2014 and August 8, 2014.

26.     Moreover, the users were sharing the exact same copy of the Motion Picture. Any digital copy of an audiovisual work may be uniquely identified by a unique, coded, string of characters called a "hash checksum." The hash checksum is a string of alphanumeric characters generated by a mathematical algorithm known as US Secure Hash Algorithm 1 or "SHA-1." By using a hash tag to identify different copies of the Motion Picture, CBC was able to confirm that these users reproduced the very same copy of the Motion Picture.

27.     The CBC software analyzed each BitTorrent "piece" distributed by each IP address listed in Complaint Exhibit C and verified that reassembling the pieces using a specialized BitTorrent client results in a fully playable digital motion picture.

28.     The software uses a geolocation functionality to determine the location of the IP addresses under investigation. The location of each IP address is set forth in Complaint Exhibit C. IP addresses are distributed to ISPs by public, nonprofit organizations called Regional Internet Registries. These registries assign blocks of IP addresses to ISPs by geographic region. Master tables correlating the IP addresses with local regions are maintained by these organizations in a publicly-available and searchable format. An IP address' geographic location can be further narrowed by cross-referencing this information with secondary sources such as data contributed to commercial database by ISPs.

29.     I acknowledge that there were other swarms, employing different "seed files," through which others copied and distributed Plaintiff's copyrighted Motion Picture before, during and after the timeframe referenced in Paragraph 25 above. Plaintiff, however, has limited the pool of Defendants in this lawsuit only to those who downloaded the movie from a single seed file in a brief and definite temporal period, specifically with the intent to prosecute an action only against defendants who were involved in the same transaction, occurrence, or series of transactions or occurrences.

5

14-cv-7052

PURSUANT TO 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the
United States of America that the foregoing is true and correct.

Executed on this 25 day of September, 2014.

By: _____
Daniel Macek

6

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| Dallas Buyers Club, LLC, | ) | |
| | ) | |
| | ) | Case No.: 3:14-cv-00811 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOES, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DANIEL MACEK IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO RULE 26(f) CONFERENCE

1.      My name is Daniel Macek.  I am over the age of 18 and am otherwise competent to make this declaration.  This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

2.      I have been retained as a consultant by Crystal Bay Corporation CBC ("CBC"), a company incorporated in South Dakota and organized and existing under the laws of the United States, in its technical department.  CBC is in the business of providing forensic investigation services to copyright owners.

3.      The Internet is a vast collection of interconnected computers and computer networks that communicate with each other.  It allows users to freely and easily exchange ideas and information, including academic research, literary works, financial data, music, audiovisual works, graphics, and an unending and ever-changing array of other data.

4.      The Internet also affords opportunities for the wide-scale infringement of copyrighted motion pictures and other digital content.

5.     Once a motion picture has been transformed into a digital format, it can be copied further and distributed an unlimited number of times over the Internet, without significant degradation in picture or sound quality.

6.     To copy and distribute copyrighted motion pictures over the Internet, many individuals use online media distribution systems or so-called peer-to peer ("P2P") or BitTorrent networks. P2P networks, at least in their most common form, are computer systems that enable Internet users to (1) make files (including motion pictures) stored on each user's computer available for copying by other users; (2) search for files stored on other users' computers; and (3) transfer exact copies of files from one computer to another via the Internet.

7.     To use a P2P or BitTorrent distribution system requires more than a click of a button. A software installation and configuration process needs to take place.

8.     The P2P systems enable widespread distribution of digital files: each user of the system who copies a digital file from another user can then distribute the file to other users and so on, so that complete digital copies can be easily and quickly distributed thereby eliminating long download times.

9.     While Plaintiff has observed the infringement occurring on the Internet, it does not know the true identities of those individuals who are committing the infringement.

10.     Additionally, the P2P methodologies for which Crystal Bay Corporation monitored for Plaintiff's Motion Picture make even small computers with low bandwidth capable of participating in large data transfers across a P2P network. The initial file-provider intentionally elects to share a file using a P2P network. This is called "seeding." Other users ("peers") on the network connect to the seeder to download. As additional peers request the same file, each additional user becomes a part of the network (or "swarm") from where the file can be downloaded. However, unlike a traditional peer-to-peer network, each new file downloader is

2

receiving a different piece of the data from each user who has already downloaded that piece of data, all of which pieces together to comprise the whole.

11.     This means that every "node" or peer user who has a copy of the infringing copyrighted material on a P2P network can also be a source of download for that infringing file, potentially both copying and distributing the infringing Motion Picture. The distributed nature of P2P leads to rapid spreading of a file throughout peer users. As more peers join the swarm, the likelihood of a successful download increases. Because of the nature of a P2P protocol, any seed peer who has downloaded a file prior to the time a subsequent peer downloads the same file is automatically a possible source for the subsequent.

12.     All infringers connected to those files are investigated through downloading a part of the file placed on their computer.

13.     This evidence is then saved on a secure server.

14.     Once the searching software program identifies an infringer in the way described herein for the Motion Picture for which Plaintiff owns the exclusive licensing and distribution rights, it automatically obtains the IP address of a user offering the file for download and saves it in a secure database.

15.     The forensic software routinely collects, identifies and records the Internet Protocol ("IP") addresses in use by those people who employ the BitTorrent protocol to share, copy, reproduce and distribute copyrighted works. In this way the software is connected to files of illegal versions of the Motion Picture.

16.     An IP address is a unique numerical identifier that is automatically assigned to an internet user by the user's Internet Service Provider ("ISP"). It only enables Plaintiff to trace the infringer's access to the Internet to a particular ISP. An ISP can be a telecommunications service provider such as Verizon, an Internet service provider such as America Online, a cable Internet

service provider such as Comcast, or even an entity such as a university that is large enough to establish its own network and link directly to the Internet. Each time a subscriber logs on, he or she may be assigned a different (or "dynamic") IP address unless the user obtains from his/her ISP a static IP address. ISPs are assigned certain blocks or ranges of IP addresses by the Internet Assigned Numbers Authority ("IANA") or a regional internet registry such as the American Registry for Internet Numbers ("ARIN"). However, some ISPs lease or otherwise allocate certain of their IP addresses to other unrelated, intermediary ISPs. These intermediaries can be identified by the ISP and the intermediaries own logs will contain the subscriber information.

17. In logs kept in the ordinary course of business, ISPs keep track of the IP addresses assigned to their subscribers. Once provided with an IP address, plus the date and time of the detected and documented infringing activity, ISPs can use their subscriber logs to identify the name, address, email address, phone number and other related information of the user/subscriber.

18. Only the ISP to whom a particular IP address has been assigned for use by its subscribers can correlate that IP address to a particular subscriber. From time to time, a subscriber of internet services may be assigned different IP addresses from their ISP. Thus, to correlate a subscriber with an IP address, the ISP also needs to know when the IP address was being used.

19. Crystal Bay Corporation determined that the Doe Defendants identified in Complaint Exhibit B were using the ISPs listed in the exhibit to gain access to the Internet and distribute and make available for distribution and copying Plaintiff's copyrighted motion picture.

20. It is possible for digital files to be mislabeled or corrupted; therefore, Crystal Bay Corporation (and accordingly, Plaintiff) does not rely solely on the labels and metadata attached to the files themselves to determine which motion picture is copied in the downloaded file, but also to confirm through a visual comparison between the downloaded file and the Motion Picture themselves.

4

21. As to Plaintiff's copyrighted Motion Picture, as identified in the Complaint, a member of Crystal Bay Corporation watches a DVD of the original Motion Picture.

22. After Crystal Bay Corporation identified the Doe Defendants and downloaded the motion pictures they were distributing, Crystal Bay Corporation opened the downloaded files, watched them and confirmed that they contained the Motion Picture identified in the Complaint.

23. To identify the IP addresses of those BitTorrent users who were copying and distributing Plaintiff's copyrighted Motion, Crystal Bay Corporation's forensic software scans peer-to-peer networks for the presence of infringing transactions.

24. After reviewing the evidence logs, I isolated the transactions and the IP addresses of the users responsible for copying and distributing the Motion Picture.

25. Through each of the transactions, the computers using the IP addresses identified in Complaint Exhibit B transmitted a copy or a part of a copy of a digital media file of the copyrighted Motion Picture identified by the hash value set forth in Complaint Exhibit B. The IP addresses, hash values, dates and times contained in Complaint Exhibit B correctly reflect what is contained in the evidence logs. The subscribers using the IP addresses set forth in Complaint Exhibit B were all part of a "swarm" of users that were reproducing, distributing, displaying or performing the copyrighted Motion Picture.

26. Moreover, the users were sharing the exact same copy of the Motion Picture. Any digital copy of an audiovisual work may be uniquely identified by a unique, coded, string of characters called a "hash checksum." The hash checksum is a string of alphanumeric characters generated by a mathematical algorithm known as US Secure Hash Algorithm 1 or "SHA-1". By using a hash tag to identify different copies of the Motion Picture, CBC was able to confirm that these users reproduced the very same copy of the Motion Picture.

5

27.     The CBC software analyzed each BitTorrent "piece" distributed by each IP address listed in Complaint Exhibit B and verified that reassembling the pieces using a specialized BitTorrent client results in a fully playable digital motion picture.

28.     The software uses a geolocation functionality to determine the location of the IP addresses under investigations. The location of each IP address is set forth in Complaint Exhibit B. IP addresses are distributed to ISPs by public, nonprofit organizations called Regional Internet Registries.  These registries assign blocks of IP addresses to ISPs by geographic region.  Master tables correlating the IP addresses with local regions are maintained by these organizations in a publicly-available and searchable format.  An IP address' geographic location can be further narrowed by cross-referencing this information with secondary sources such as data contributed to commercial database by ISPs.

## FURTHER DECLARANT SAYETH NAUGHT.

### DECLARATION

PURSUANT TO 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 26 day of November, 2014.

By: _____
        Daniel Macek

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COBBLER NEVADA, LLC,           )
                               )
        Plaintiff,             )     Case No.:  15-cv-5282
                               )
v.                             )
                               )     Judge Ronald A. Guzman
DOES 1- 37,                    )
                               )
        Defendants.            )

## DECLARATION OF DANIEL MACEK IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO RULE 26(f) CONFERENCE

1.      My name is Daniel Macek. I am over the age of 18 and am otherwise competent to make this declaration. This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

2.      I have been retained as a consultant by Maverickeye UG ("MEU"), a company incorporated in Stuttgart and organized and existing under the laws of Germany, in its technical department. MEU is in the business of providing forensic investigation services to copyright owners.

3.      The Internet is a vast collection of interconnected computers and computer networks that communicate with each other. It allows users to freely and easily exchange ideas and information, including academic research, literary works, financial data, music, audiovisual works, graphics, and an unending and ever-changing array of other data.

4.      The Internet also affords opportunities for the wide-scale infringement of copyrighted motion pictures and other digital content.

5.      Once a motion picture has been transformed into a digital format, it can be copied further and distributed an unlimited number of times over the Internet, without significant degradation in picture or sound quality.

6.      To copy and distribute copyrighted motion pictures over the Internet, many individuals use online media distribution systems or so-called peer-to peer ("P2P") or BitTorrent networks. P2P networks,

15-cv-5282

at least in their most common form, are computer systems that enable Internet users to (1) make files (including motion pictures) stored on each user's computer available for copying by other users; (2) search for files stored on other users' computers; and (3) transfer exact copies of files from one computer to another via the Internet.

7.      To use a P2P or BitTorrent distribution system requires more than a click of a button. A software installation and configuration process needs to take place.

8.      The P2P systems enable widespread distribution of digital files: each user of the system who copies a digital file from another user can then distribute the file to other users and so on, so that complete digital copies can be easily and quickly distributed thereby eliminating long download times.

9.      While Plaintiff has observed the infringement occurring on the Internet, it does not know the true identities of those individuals who are committing the infringement.

10.     Additionally, the P2P methodologies which Maverickeye UG monitored for Plaintiff's Motion Picture (*The Cobbler*) make even small computers with low bandwidth capable of participating in large data transfers across a P2P network. The initial file-provider intentionally elects to share a file using a P2P network. This is called "seeding." Other users ("peers") on the network connect to the seeder to download. As additional peers request the same file, each additional user becomes a part of the network (or "swarm") from which the file can be downloaded. However, unlike a traditional peer-to-peer network, each new file downloader is receiving a different piece of the data from each user who has already downloaded that piece of data, all of which pieces together comprise the whole.

11.     This means that every "node" or peer user who has a copy of the infringing copyrighted material on a P2P network can also be a source of download for that infringing file, potentially both copying and distributing the copyrighted Motion Picture. The distributed nature of P2P leads to rapid spreading of a file throughout peer users. As more peers join the swarm, the likelihood of a successful download increases. Because of the nature of a P2P protocol, any seed peer who has downloaded a file prior to the time a subsequent peer downloads the same file is automatically a possible source for the subsequent peer.

2

15-cv-5282

12.    All infringers connected to those files are investigated through downloading a part of the file placed on their computer.

13.    This evidence is then saved on a secure server.

14.    Once the searching software program identifies an infringer in the way described herein for the Motion Picture for which Plaintiff owns the exclusive licensing and distribution rights, it automatically obtains the IP address of a user offering the file for download and saves it in a secure database.

15.    The forensic software routinely collects, identifies and records the Internet Protocol ("IP") addresses in use by those people who employ the BitTorrent protocol to share, copy, reproduce and distribute copyrighted works. In this way, the software is connected to files of illegal versions of the Motion Picture.

16.    An IP address is a unique numerical identifier that is automatically assigned to an Internet user by the user's Internet Service Provider ("ISP"). It only enables Plaintiff to trace the infringer's access to the Internet to a particular ISP. An ISP can be a telecommunications service provider such as Verizon, an Internet service provider such as America Online, a cable Internet service provider such as Comcast, or even an entity such as a university that is large enough to establish its own network and link directly to the Internet. Each time a subscriber logs on, he or she may be assigned a different (or "dynamic") IP address unless the user obtains from his/her ISP a static IP address. ISPs are assigned certain blocks or ranges of IP addresses by the Internet Assigned Numbers Authority ("IANA") or a regional internet registry such as the American Registry for Internet Numbers ("ARIN"). However, some ISPs lease or otherwise allocate certain of their IP addresses to other unrelated, intermediary ISPs. These intermediaries can be identified by the ISP, and the logs of the intermediaries will contain the subscriber information.

17.    In logs kept in the ordinary course of business, ISPs keep track of the IP addresses assigned to their subscribers. Once provided with an IP address, plus the date and time of the detected and documented infringing activity, ISPs can use their subscriber logs to identify the name, address, email address, phone number and other related information of the user/subscriber.

3

15-cv-5282

18.     Only the ISP to whom a particular IP address has been assigned for use by its subscribers can correlate that IP address to a particular subscriber. From time to time, a subscriber of Internet services may be assigned different IP addresses from their ISP. Thus, to correlate a subscriber with an IP address, the ISP also needs to know when the IP address was being used.

19.     Maverickeye UG determined that the Doe Defendants identified in Complaint Exhibit B were using the ISPs listed in the exhibit to gain access to the Internet and distribute and make available for distribution and copying Plaintiff's copyrighted Motion Picture.

20.     It is possible for digital files to be mislabeled or corrupted; therefore, Maverickeye UG (and accordingly, Plaintiff) does not rely solely on the labels and metadata attached to the files themselves to determine whether or not a particular motion picture is copied in the downloaded file, but also confirms the copying by a visual comparison of the downloaded file and the Motion Picture.

21.     As to Plaintiff's copyrighted Motion Picture, as identified in the Complaint, a member of Maverickeye UG watches a DVD of the original Motion Picture.

22.     After Maverickeye UG identifies the Doe Defendants and downloads the motion pictures they were distributing, Maverickeye UG opens the downloaded files, watches them and confirms that they contain the Motion Picture identified in the Complaint.

23.     To identify the IP addresses of those BitTorrent users who were copying and distributing Plaintiff's copyrighted Motion, Maverickeye UG's forensic software scans peer-to-peer networks for the presence of infringing transactions.

24.     After reviewing the evidence logs, I isolated the transactions and the IP addresses of the users responsible for copying and distributing the Motion Picture.

25.     Through each of the transactions, the computers using the IP addresses identified in Complaint Exhibit B transmitted a copy or a part of a copy of a digital media file of the copyrighted Motion Picture identified by the hash value set forth in Complaint Exhibit B. The IP addresses, hash values, dates and times contained in Complaint Exhibit B correctly reflect what is contained in the evidence logs. The subscribers using the IP addresses set forth in Complaint Exhibit B were all part of a single "swarm" of

4

15-cv-5282

users who were reproducing, distributing, displaying or performing the copyrighted Motion Picture between March 15, 2015 and March 20, 2015.

26.     Moreover, the users were sharing the exact same copy of the Motion Picture. Any digital copy of an audiovisual work may be uniquely identified by a unique, coded, string of characters called a "hash checksum." The hash checksum is a string of alphanumeric characters generated by a mathematical algorithm known as US Secure Hash Algorithm 1 or "SHA-1." By using a hash tag to identify different copies of the Motion Picture, MEU was able to confirm that these users reproduced the very same copy of the Motion Picture.

27.     The MEU software analyzed each BitTorrent "piece" distributed by each IP address listed in Complaint Exhibit B and verified that reassembling the pieces using a specialized BitTorrent client results in a fully playable digital motion picture.

28.     The software uses a geolocation functionality to determine the location of the IP addresses under investigation. The location of each IP address is set forth in Complaint Exhibit B. IP addresses are distributed to ISPs by public, nonprofit organizations called Regional Internet Registries. These registries assign blocks of IP addresses to ISPs by geographic region. Master tables correlating the IP addresses with local regions are maintained by these organizations in a publicly-available and searchable format. An IP address' geographic location can be further narrowed by cross-referencing this information with secondary sources such as data contributed to commercial database by ISPs.

29.     I acknowledge that there were other swarms, employing different "seed files," through which others copied and distributed Plaintiff's copyrighted Motion Picture before, during and after the timeframe referenced in Paragraph 25 above. Plaintiff, however, has limited the pool of Defendants in this lawsuit only to those who downloaded the movie from a single seed file in a brief and definite temporal period, specifically with the intent to prosecute an action only against defendants who were involved in the same transaction, occurrence, or series of transactions or occurrences.

5

15-cv-5282

PURSUANT TO 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Executed on this ☒ day of July 2015.

By: _____
Daniel Macek

6

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

Clear Skies Nevada, LLC,       )
                            )
                            )  Case No.:  15-cv-00508
       Plaintiff,           )
                            )
v.                            )
                            )
DOES,                  )
                            )
       Defendants.        )

## DECLARATION OF DANIEL MACEK IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO RULE 26(f) CONFERENCE

      1.     My name is Daniel Macek.  I am over the age of 18 and am otherwise competent to make this declaration.  This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

      2.     I have been retained as a consultant by Maverickeye UG ("MEU"), a company incorporated in Stuttgart and organized and existing under the laws of Germany, in its technical department.  MEU is in the business of providing forensic investigation services to copyright owners.

      3.     The Internet is a vast collection of interconnected computers and computer networks that communicate with each other.  It allows users to freely and easily exchange ideas and information, including academic research, literary works, financial data, music, audiovisual works, graphics, and an unending and ever-changing array of other data.

      4.     The Internet also affords opportunities for the wide-scale infringement of copyrighted motion pictures and other digital content.

5.      Once a motion picture has been transformed into a digital format, it can be copied further and distributed an unlimited number of times over the Internet, without significant degradation in picture or sound quality.

6.      To copy and distribute copyrighted motion pictures over the Internet, many individuals use online media distribution systems or so-called peer-to peer ("P2P") or BitTorrent networks. P2P networks, at least in their most common form, are computer systems that enable Internet users to (1) make files (including motion pictures) stored on each user's computer available for copying by other users; (2) search for files stored on other users' computers; and (3) transfer exact copies of files from one computer to another via the Internet.

7.      To use a P2P or BitTorrent distribution system requires more than a click of a button. A software installation and configuration process needs to take place.

8.      The P2P systems enable widespread distribution of digital files: each user of the system who copies a digital file from another user can then distribute the file to other users and so on, so that complete digital copies can be easily and quickly distributed thereby eliminating long download times.

9.      While Plaintiff has observed the infringement occurring on the Internet, it does not know the true identities of those individuals who are committing the infringement.

10.      Additionally, the P2P methodologies for which Maverickeye UG monitored for Plaintiff's Motion Picture make even small computers with low bandwidth capable of participating in large data transfers across a P2P network. The initial file-provider intentionally elects to share a file using a P2P network. This is called "seeding." Other users ("peers") on the network connect to the seeder to download. As additional peers request the same file, each additional user becomes a part of the network (or "swarm") from where the file can be downloaded. However, unlike a traditional peer-to-peer network, each new file downloader is

2

receiving a different piece of the data from each user who has already downloaded that piece of data, all of which pieces together to comprise the whole.

11. This means that every "node" or peer user who has a copy of the infringing copyrighted material on a P2P network can also be a source of download for that infringing file, potentially both copying and distributing the infringing Motion Picture. The distributed nature of P2P leads to rapid spreading of a file throughout peer users. As more peers join the swarm, the likelihood of a successful download increases. Because of the nature of a P2P protocol, any seed peer who has downloaded a file prior to the time a subsequent peer downloads the same file is automatically a possible source for the subsequent.

12. All infringers connected to those files are investigated through downloading a part of the file placed on their computer.

13. This evidence is then saved on a secure server.

14. Once the searching software program identifies an infringer in the way described herein for the Motion Picture for which Plaintiff owns the exclusive licensing and distribution rights, it automatically obtains the IP address of a user offering the file for download and saves it in a secure database.

15. The forensic software routinely collects, identifies and records the Internet Protocol ("IP") addresses in use by those people who employ the BitTorrent protocol to share, copy, reproduce and distribute copyrighted works. In this way the software is connected to files of illegal versions of the Motion Picture.

16. An IP address is a unique numerical identifier that is automatically assigned to an internet user by the user's Internet Service Provider ("ISP"). It only enables Plaintiff to trace the infringer's access to the Internet to a particular ISP. An ISP can be a telecommunications service provider such as Verizon, an Internet service provider such as America Online, a cable Internet

3

service provider such as Comcast, or even an entity such as a university that is large enough to

establish its own network and link directly to the Internet. Each time a subscriber logs on, he or

she may be assigned a different (or "dynamic") IP address unless the user obtains from his/her ISP

a static IP address. ISPs are assigned certain blocks or ranges of IP addresses by the Internet

Assigned Numbers Authority ("IANA") or a regional internet registry such as the American

Registry for Internet Numbers ("ARIN"). However, some ISPs lease or otherwise allocate certain

of their IP addresses to other unrelated, intermediary ISPs. These intermediaries can be identified

by the ISP and the intermediaries own logs will contain the subscriber information.

17.    In logs kept in the ordinary course of business, ISPs keep track of the IP addresses

assigned to their subscribers. Once provided with an IP address, plus the date and time of the

detected and documented infringing activity, ISPs can use their subscriber logs to identify the

name, address, email address, phone number and other related information of the user/subscriber.

18.    Only the ISP to whom a particular IP address has been assigned for use by its

subscribers can correlate that IP address to a particular subscriber. From time to time, a subscriber

of internet services may be assigned different IP addresses from their ISP. Thus, to correlate a

subscriber with an IP address, the ISP also needs to know when the IP address was being used.

19.    Maverickeye UG determined that the Doe Defendants identified in Complaint

Exhibit B were using the ISPs listed in the exhibit to gain access to the Internet and distribute and

make available for distribution and copying Plaintiff's copyrighted motion picture.

20.    It is possible for digital files to be mislabeled or corrupted; therefore, Maverickeye

UG (and accordingly, Plaintiff) does not rely solely on the labels and metadata attached to the files

themselves to determine which motion picture is copied in the downloaded file, but also to

confirm through a visual comparison between the downloaded file and the Motion Picture

themselves.

4

21. As to Plaintiff's copyrighted Motion Picture, as identified in the Complaint, a member of Maverickeye UG watches a DVD of the original Motion Picture.

22. After Maverickeye UG identified the Doe Defendants and downloaded the motion pictures they were distributing, Maverickeye UG opened the downloaded files, watched them and confirmed that they contained the Motion Picture identified in the Complaint.

23. To identify the IP addresses of those BitTorrent users who were copying and distributing Plaintiff's copyrighted Motion Picture, Maverickeye UG's forensic software scans peer-to-peer networks for the presence of infringing transactions.

24. After reviewing the evidence logs, I isolated the transactions and the IP addresses of the users responsible for copying and distributing the Motion Picture.

25. Through each of the transactions, the computers using the IP addresses identified in Complaint Exhibit B transmitted a copy or a part of a copy of a digital media file of the copyrighted Motion Picture identified by the hash value set forth in Complaint Exhibit B. The IP addresses, hash values, dates and times contained in Complaint Exhibit B correctly reflect what is contained in the evidence logs. The subscribers using the IP addresses set forth in Complaint Exhibit B were all part of a "swarm" of users that were reproducing, distributing, displaying or performing the copyrighted Motion Picture.

26. Moreover, the users were sharing the exact same copy of the Motion Picture. Any digital copy of an audiovisual work may be uniquely identified by a unique, coded, string of characters called a "hash checksum." The hash checksum is a string of alphanumeric characters generated by a mathematical algorithm known as US Secure Hash Algorithm 1 or "SHA-1". By using a hash tag to identify different copies of the Motion Picture, MEU was able to confirm that these users reproduced the very same copy of the Motion Picture.

Case 3:15-cv-00508-bhc Document #: 4 Filed: 09/01/15 Page 6 of 6

27.     The MEU software analyzed each BitTorrent "piece" distributed by each IP address listed in Complaint Exhibit B and verified that reassembling the pieces using a specialized BitTorrent client results in a fully playable digital motion picture.

28.     The software uses a geolocation functionality to determine the location of the IP addresses under investigations. The location of each IP address is set forth in Complaint Exhibit B. IP addresses are distributed to ISPs by public, nonprofit organizations called Regional Internet Registries.  These registries assign blocks of IP addresses to ISPs by geographic region.  Master tables correlating the IP addresses with local regions are maintained by these organizations in a publicly-available and searchable format.  An IP address' geographic location can be further narrowed by cross-referencing this information with secondary sources such as data contributed to commercial database by ISPs.

## FURTHER DECLARANT SAYETH NAUGHT.

### DECLARATION

PURSUANT TO 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _1_ day of _Sept_ , 2015.

By: _____
        Daniel Macek