**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CLEAR SKIES NEVADA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 15-cv-6708 |
| | ) | |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| RENEE HANCOCK, | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBITS TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF
VOLUNTARY DISMISSAL WITHOUT PREJUDICE AND WITHOUT FEES/COSTS**

1.  *McLaughlin v. Cheshire*, 676 F.2d 855 (D.C. Cir. 1982);

2.  *Moore v. St. Louis Music Supply Co.*, 539 F.2d 1191 (8th Cir. 1976):

3.  *PRISM Rehab Sys., Inc. v. Embassy Care Ctr., Inc.*, No. 99-cv-4104, 2002 WL 992666 (N.D. Ill. May 15, 2002);

4.  *Bridgeport Music, Inc. v. Universal-MCA Music Publ'g, Inc.*, 583 F.3d 948 (6th Cir. 2009);

5.  *DWG Corp. v. Granada Investments, Inc.*, 962 F.2d 1201 (6th Cir. 1992);

6.  *Davis v. USX Corp.*, 819 F.2d 1270 (4th Cir. 1987);

7.  *Pontenberg v. Boston Sci. Corp.*, 252 F.3d 1253 (11th Cir. 2001);

8.  Jason Weinstein, Deputy Assistant Attorney General – Criminal Division, Dep't. of Justice, "Protecting Mobile Privacy: Your Smartphones, Tablets, Cell Phones and Your Privacy," (May 10, 2011); and

9.  *Spacesaver Corp. v. The Marvel Group*, No. 08-cv-354, 2009 WL 3297248 (W.D. Wisc. 2009).

# EXHIBIT 1

676 F.2d 855
United States Court of Appeals,
District of Columbia Circuit.

Francis X. McLAUGHLIN, et al., Appellants,
v.
Maxine CHESHIRE.

No. 81-2216.
|
Argued April 15, 1982.
|
Decided April 30, 1982.

Appeal was taken from orders of the United States District Court for the District of Columbia, Gerhard A. Gesell, J., conditioning the grant of voluntary dismissal on the payment of $4,000 in costs. The Court of Appeals held that when the plaintiff seeks a voluntary dismissal in one forum to pursue pending litigation against the defendant in another forum, the defendant is not entitled to reimbursement for expenses incurred in preparing work product that had been or will be useful in the continuing litigation.

Orders vacated.

West Headnotes (4)

[1]     **Federal Civil Procedure**
        ⟿ Terms and Conditions
        District court has broad discretion to impose conditions on granting plaintiffs' motions for voluntary dismissal without prejudice after adverse party has filed motion for summary judgment, but that discretion is limited to imposing conditions that will alleviate harm the defendant will suffer if motion is granted. Fed.Rules Civ.Proc. Rule 41(a)(2), 28 U.S.C.A.

        10 Cases that cite this headnote

[2]     **Federal Civil Procedure**
        ⟿ Payment of Costs and Expenses
        When plaintiff seeks voluntary dismissal in one forum to pursue pending litigation against

defendant in another forum, defendant is not entitled to reimbursement for expenses incurred in preparing work product that has been or will be useful in continuing litigation. Fed.Rules Civ.Proc. Rule 41(a)(2), 28 U.S.C.A.

        25 Cases that cite this headnote

[3]     **Federal Civil Procedure**
        ⟿ Payment of Costs and Expenses
        District court erred in conditioning granting of plaintiff's motion for voluntary dismissal on payment of over $4,000 in costs when plaintiff sought voluntary dismissal to pursue litigation against defendant in another forum. Fed.Rules Civ.Proc. Rule 41(a)(2), 28 U.S.C.A.

        7 Cases that cite this headnote

[4]     **Federal Civil Procedure**
        ⟿ Payment of Costs and Expenses
        Plaintiffs seeking voluntary dismissals that do not terminate litigation between the parties should not be required to pay more than difference between defendants' actual expenses and those they would have incurred had plaintiffs filed a single action in the forum where the litigation will proceed. Fed.Rules Civ.Proc. Rule 41(a)(2), 28 U.S.C.A.

        15 Cases that cite this headnote

**\*856  \*\*258** Appeal from the United States District Court for the District of Columbia (D.C. Civil Action No. 81-00779).

**Attorneys and Law Firms**

Francis L. McLaughlin, pro se, for appellants.

David E. Kendall, Washington, D. C., with whom Kevin T. Baine, Washington, D. C., was on the brief, for appellee.

Before WRIGHT, TAMM, and GINSBURG, Circuit Judges.

**Opinion**

Opinion PER CURIAM.

PER CURIAM:

This appeal requires us to address the limits on the District Court's discretion to require a plaintiff to pay a defendant's reasonable expenses when the plaintiff seeks voluntary dismissal of one action to pursue related claims in another forum.

On April 1, 1981 appellants amended their complaint in a Maryland state court action to include appellee as a defendant; on April 2, 1981 appellants filed actions against appellee in the United States District Court for the District of Columbia, and against appellee's former employer, The Washington Post, in the United States District Court for the District of Maryland. All three actions apparently involve similar-if not identical-factual contentions and claims for relief.

On June 2, 1981, after appellee had filed a motion to dismiss or for summary judgment, appellants sought voluntary dismissal of their District of Columbia action, stating their intention to pursue their claims against appellee in the state court action in Maryland. Pursuant to Federal Rule of Civil Procedure 41(a)(2), the District Court required appellants to pay appellee's reasonable attorney fees and costs incurred in this action, as a condition on granting a dismissal without prejudice. Appellee submitted a statement of costs and legal fees, which the District Court approved in full, except for reducing the lawyers' hourly rate. Appellants requested but were denied a full evidentiary hearing. On July 28, 1981 the District Court granted appellants' motion to dismiss without prejudice subject to payment by them to appellee of $4,032.35. Payment was not forthcoming, and on October 20, 1981 the District Court granted appellee's motion to dismiss with prejudice. This appeal followed.

**[1]** The District Court has broad discretion to impose conditions on granting plaintiffs' motions for voluntary dismissal without prejudice after the adverse party has filed a motion for summary judgment. See Fed.R.Civ.P. 41(a)(2). But that discretion is limited to imposing conditions that will alleviate harm (other than tactical disadvantage) that the defendant will suffer if the motion

is granted. LeCompte v. Mr. Chip, Inc., 528 F.2d 601, 604-605 (5th Cir. 1976).

**[2]** It is common for courts to require plaintiffs to pay their opponents' reasonable legal fees and costs as a condition of dismissal under Rule 41(a) (2). However, **\*857 \*\*259** where a plaintiff seeks voluntary dismissal in one forum to pursue pending litigation against the defendant in another forum, the defendant is not entitled to reimbursement for expenses incurred in preparing work product that has been or will be useful in the continuing litigation. GAF Corp. v. Transamerica Insurance Co., 665 F.2d 364, 369 (D.C.Cir.1981). Defendants do not suffer harm from having to pay the full cost of defending an action in a proper forum, and plaintiffs should not be forced to pay for work that is being or will be used against them in ongoing litigation. Therefore, plaintiffs seeking Rule 41(a)(2) dismissals that do not terminate litigation between the parties should not be required to pay more than the difference between the defendants' actual expenses and those they would have incurred had the plaintiffs filed a single action in the forum where litigation will proceed.

**[3]** In this case the same law firm is representing appellee and her former employer in this action and in the ongoing litigation in state and federal courts in Maryland. In opposing appellee's statement of expenses, appellants maintained that appellee's lawyers were charging for work they did in preparing motions in this action, when nearly identical motions were filed in the two ongoing actions in Maryland. Yet the District Court did not inquire into whether this had occurred, and the record is bare of facts or any statement of reasons by the District Court showing why payment of over $4,000 was a reasonable condition to impose on granting appellants' motion. Given appellants' allegations and the likelihood that $4,000 represents more than the "marginal cost" to appellee of defending, briefly, a second lawsuit, this record requires us to vacate the District Court's orders of July 28, 1981 and October 20, 1981. See LeCompte v. Mr. Chip, Inc., supra, 528 F.2d at 605.

In the further proceedings required to end the dispute over appellants' request for dismissal without prejudice, the District Court may, in its discretion, rely entirely on written submissions from the parties or hold an evidentiary hearing to resolve issues of fact that cannot be resolved on the papers submitted. See Copeland v.

**McLaughlin v. Cheshire, 676 F.2d 855 (1982)**

219 U.S.App.D.C. 257, 33 Fed.R.Serv.2d 1531

Marshall, 641 F.2d 880, 905 (D.C.Cir.1980) (en banc ). If appellee wishes to pursue her claim for reasonable expenses incurred in this action, she should file in the District Court a statement of legal fees and costs, along with supporting documentation. That statement should show what expenses were incurred solely on account of this action (e.g., costs of filing motions, making copies of motions, preparing motions useful only in this action) and what expenses were incurred for work product that has been or may be useful to appellee or to The Washington Post in other litigation pending at the time appellants' motion for voluntary dismissal was filed.

Judgment accordingly.

## All Citations

676 F.2d 855, 219 U.S.App.D.C. 257, 33 Fed.R.Serv.2d 1531

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

**Moore v. St. Louis Music Supply Co., Inc., 539 F.2d 1191 (1976)**

13 Fair Empl.Prac.Cas. (BNA) 257, 12 Empl. Prac. Dec. P 11,129, 22 Fed.R.Serv.2d 149

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Florence by Matthews v. Taylor, Ark., September 9, 1996

539 F.2d 1191
United States Court of Appeals,
Eighth Circuit.

Raymond MOORE, Appellant,

v.

ST. LOUIS MUSIC SUPPLY
COMPANY, INC., Appellee.

No. 76-1073.
|
Submitted May 12, 1976.
|
Decided Aug. 12, 1976.

Action was brought under Title VII of Civil Rights Act of 1964. The United States District Court for the Eastern District of Missouri, John K. Regan, J., dismissed case with prejudice when neither plaintiff nor his attorney appeared on day when case reached docket and plaintiff appealed. The Court of Appeals, Webster, Circuit Judge, held that the absence of plaintiff or attorney resulting from failure of attorney to keep himself informed about progress of the docket and to report to the district court did not warrant dismissal with prejudice and, inasmuch as it appeared that the short 30-day statute of limitations applicable to filing Title VII cases had expired so that dismissal without prejudice would operate to leave parties as if no action had been brought at all, the judgment of dismissal would be vacated and remanded.

Reversed and remanded.

West Headnotes (5)

[1]    **Federal Courts**
         ⟜ Dismissal or nonsuit in general
       **Federal Courts**
         ⟜ Preliminary proceedings
       In reviewing order dismissing case for failure to comply with rules or for failure to prosecute, Court of Appeals considers whether, in exercise of that power, the district court has exceeded permissible range

of its discretion by determining whether, in particular circumstances of case, needs of court in advancing crowded docket and preserving respect for integrity of its internal procedures are sufficient to justify harsh consequences of forever denying litigant his day in court. Fed.Rules Civ.Proc. rule 41(b). 28 U.S.C.A.

22 Cases that cite this headnote

[2]    **Federal Courts**
         ⟜ Dismissal or nonsuit in general
       In reviewing order dismissing case for failure to comply with rules or for failure to prosecute, court focuses in the main upon degree of egregious conduct which prompted the order of dismissal and to a lesser extent upon adverse impact of such conduct upon both defendant and administration of justice in district court. Fed.Rules Civ.Proc. rule 41(b), 28 U.S.C.A.

14 Cases that cite this headnote

[3]    **Federal Civil Procedure**
         ⟜ Failure to Prosecute
       **Federal Courts**
         ⟜ Need for further evidence, findings, or conclusions
       Failure of attorney to keep himself informed about progress of docket and to report to district court so that neither he nor client appeared when case was reached on the docket did not warrant dismissal of case with prejudice and where it appeared that 30-day statute of limitations applicable to Title VII case had expired and that, following dismissal without prejudice, statute of limitations would be deemed not to have been suspended during period in which suit was pending, judgment of dismissal would be vacated and case remanded for further proceedings. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

20 Cases that cite this headnote

**Moore v. St. Louis Music Supply Co., Inc., 539 F.2d 1191 (1976)**

13 Fair Empl.Prac.Cas. (BNA) 257, 12 Empl. Prac. Dec. P 11,129, 22 Fed.R.Serv.2d 149

[4]   **Federal Civil Procedure**
  ⟜ Effect
  Dismissal without prejudice operates to leave parties as if no action had been brought at all.

  15 Cases that cite this headnote

[5]   **Limitation of Actions**
  ⟜ Dismissal or nonsuit in general
  Following dismissal without prejudice, statute of limitations is deemed not to have been suspended during period in which suit was pending.

  12 Cases that cite this headnote

**Attorneys and Law Firms**

*1192 Elbert Dorsey, St. Louis, Mo., for appellant.

Frank Hamsher, St. Louis, Mo., for appellee.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH, Senior District Judge. *

**Opinion**

WEBSTER, Circuit Judge.

Appellant Raymond Moore brought an action in the District Court under Title VII of the Civil Rights Act of 1964. In due course, his case was set for trial along with other cases on Monday, July 21, 1975. On that day, his attorney appeared and announced ready for trial. His case was not reached on the docket, however, until Wednesday, July 23. When neither Moore nor his attorney appeared on July 23, despite repeated efforts by the District Court to contact the attorney and numerous messages left at his office, the District Court *1193 dismissed the case with prejudice. [1] This appeal followed.

[1]   The District Court has power to dismiss a case for failure to comply with its rules and for failure to prosecute. Fed.R.Civ.P. 41(b). In reviewing such an order, we consider whether in the exercise of that power the District Court has exceeded the permissible range of its discretion. Link v. Wabash R. R., 370 U.S. 626, 633, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). This necessarily requires us to consider whether in the particular circumstances of the case the needs of the court in advancing a crowded docket and preserving respect for the integrity of its internal procedures are sufficient to justify the harsh consequences of forever denying a litigant his day in court. Reizakis v. Loy, 490 F.2d 1132, 1135 (4th Cir. 1974). See generally 9 C. Wright & A. Miller, Federal Practice and Procedure ss 2369-70 (1971).

[2]   This process of balancing focuses in the main upon the degree of egregious conduct which prompted the order of dismissal and to a lesser extent upon the adverse impact of such conduct upon both the defendant and the administration of justice in the District Court. See Bush v. United States Postal Service, 496 F.2d 42, 44-45 (4th Cir. 1974); Reizakis v. Loy, supra, 490 F.2d at 1135; Durham v. Florida East Coast Ry., 385 F.2d 366, 367-69 (5th Cir. 1967). See also Annot., 20 A.L.R.Fed. 488 (1974). Where the offending conduct results from conflicting court commitments of the attorney rather than the indifference or dilatory tactics of the litigant himself, there are other tools at the trial judge's disposal which do not impact so decisively upon the innocent litigant. [2] See Flaksa v. Little River Marine Construction Co., 389 F.2d 885, 887-89 (5th Cir.), cert. denied, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968). "(D)ismissal with prejudice for failure to prosecute is ' * * * a drastic sanction which should be sparingly exercised * * *.' " Navarro v. Chief of Police, 523 F.2d 214, 217 (8th Cir. 1975), quoting Welsh v. Automatic Poultry Feeder Co., 439 F.2d 95, 96 (8th Cir. 1971).

The record in this case does not suggest any unnecessary delay or impropriety attributable to Moore prior to the first trial setting on July 21. On that day, Moore's attorney advised the District Court that he had other trial commitments later in the week. He announced ready, however, when the District Court properly refused to accept a "subject to" announcement. When the District Court then started the first of its criminal cases, Moore's attorney turned to his other professional assignments. These took him to Illinois and ultimately to Jefferson City, Missouri, where he was preparing a criminal case for trial the next day when Moore's case finally was reached in Saint Louis on July 23. [3]

While an attorney is an officer of the court and has undertaken a solemn obligation to respect and uphold its processes, it is also true that he is more often than not the officer of many courts whose processes are not

coordinated and frequently compete for the attorney's attention and presence. Some courts appear to demand a greater priority than others; such demands are often said to exacerbate state-federal relations. Attorneys who hide behind the demands of one court in order to evade their obligations to another court only prompt a continuing escalation of pressure by judges intent upon making headway against a spiraling **\*1194** docket. It is not an easy problem to resolve. Compare Leong v. Railroad Transfer Service. Inc., 302 F.2d 555, 557-58 (7th Cir. 1962) (Schnackenberg, J., concurring).

[3]    In this case, the attorney for Moore was overextended. Though he had numerous opportunities to present his conflict problem to the District Court, he did not do so. By failing to keep himself informed about the progress of the docket and in not reporting to the District Court, the attorney inexcusably caused available court time to go unused when such court time was badly needed to meet the court's caseload. For this he may properly be subject to discipline, but it does not follow in this case that his client should be the one to feel the lash. See Moreno v. Collins, 362 F.2d 176, 178 (7th Cir. 1966). A more appropriate action would generally be dismissal without prejudice. Bardin v. Mondon, 298 F.2d 235. 238 (2d Cir. 1961). See Durham v. Florida East Coast Ry., supra, 385 F.2d at 369.

[4]    [5]    We do not direct dismissal without prejudice, however, because it would appear that the short thirty day statute of limitations applicable to filing Title VII cases has expired. See Pond v. Braniff Airways, Inc., 453 F.2d 347, 349 (5th Cir. 1972). Dismissal without prejudice operates to leave the parties as if no action had been brought at all. Following such dismissal the statute of limitations is deemed not to have been suspended during the period in which the suit was pending. Bomer v. Ribicoff, 304 F.2d 427, 428-29 (6th Cir. 1962). See Hall v. Kroger Baking Co., 520 F.2d 1204, 1205 (6th Cir. 1975); Cleveland v. Douglas Aircraft Co., 509 F.2d 1027, 1029-30 (9th Cir. 1975). Accordingly, we simply vacate the judgment of dismissal and remand for further proceedings. We leave to the sound discretion of the District Court the assessment of court costs for the period prior to dismissal, as well as the consideration of any disciplinary action it may deem appropriate. In view of the circumstances, each party shall bear its own costs on appeal.

Reversed and remanded.

**All Citations**

539 F.2d 1191, 13 Fair Empl.Prac.Cas. (BNA) 257, 12 Empl. Prac. Dec. P 11,129, 22 Fed.R.Serv.2d 149

**Footnotes**

*      The Honorable Talbot Smith, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

1      A motion to reconsider, filed eight days after the order of dismissal, was also denied.

2      Alternatives to dismissal with prejudice include requiring payment of court costs and jury expenses, dismissal without prejudice, and civil contempt proceedings. In some cases, the attorney himself should be made to shoulder the cost. See, e. g., Bardin v. Mondon, 298 F.2d 235, 238 (2d Cir. 1961).

3      Moore's attorney concedes that he became aware early in the morning of July 23 that Moore's case would be reached that day. He was in Saint Louis at the time. He stated in oral argument that he attempted to reach the District Judge by telephone at his chambers at 8:15 a. m. and that when there was no response, he proceeded to Jefferson City after having left word at his office to notify the court.

**End of Document**                                                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

2002 WL 992666
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

PRISM REHAB SYSTEMS, INC.; Mariner
Rehabilitation Services, Inc.; Plaintiffs,
v.
EMBASSY CARE CENTER, INC., d/b/a
Embassy Care, Inc.; Peterson Park Associates
Limited Partnership, d/b/a Peterson Park
Health Care Center, Inc. and Peterson
Park Health Care Center, L.P.; Burnham
Terrace, Ltd.; and Endee, L.L.C.; Defendants.

No. 99 C 4104, 99 C 4513.
|
May 15, 2002.

MEMORANDUM OPINION AND ORDER

DARRAH, J.

*1 Plaintiffs, Prism Rehab Systems, Inc. and
Mariner Rehabilitation Services, Inc. ("Plaintiffs"), move,
pursuant to Federal Rule of Civil Procedure 41(a)(2),
for dismissal without prejudice of Counts II, III, V,
VI, VIII and IX in Case No. 99 C 4104 and Counts
II and III in Case No. 99 C 4513. For the reasons
that follow, Plaintiffs' Motion to Dismiss All Remaining
Counts without Prejudice is granted.

BACKGROUND

Plaintiffs filed complaints in Case Nos. 99 C 4104 and
99 C 4513 on or about June 21, 1999 and July 8, 1999,
respectively. On November 10, 1999, Case No. 99 C 4513
was reassigned as related to Case No. 99 C 4104.

The complaints allege four counts based on promissory
notes ("Promissory Note Counts") executed by
Defendants and the remaining counts for claims of
*quantum meruit*. Summary judgment on the Promissory
Note Counts was granted in favor of Plaintiffs on
September 26, 2001. The Promissory Note Counts
represent more than half of the total amount Plaintiffs
seek in these cases. However, it is uncertain whether

Plaintiffs will be able to collect that amount due to
Defendants' precarious financial condition. A discovery
cut-off has been set for May 10, 2002; and a trial on the
remaining counts is scheduled for September 9, 2002.

Due to Defendants' poor financial condition, Plaintiffs
believe that it is more cost-effective to voluntarily dismiss
the remaining counts and thereby avoid additional
attorneys' fees and costs associated with prosecuting these
counts. Defendants' sole objection is that the remaining
counts should be dismissed with prejudice.

ANALYSIS

Rule 41(a)(2) provides that after the defendant has filed
an answer or a motion for summary judgment,

> an action shall not be dismissed
> at the plaintiff's instance save upon
> order of the court and upon such
> terms and conditions as the court
> deems proper. If a counterclaim has
> been pleaded by a defendant prior
> to the service upon the defendant of
> the plaintiff's motion to dismiss, the
> action shall not be dismissed against
> the defendant's objection unless the
> counterclaim can remain pending for
> independent adjudication by the court.
> Unless otherwise specified in the order,
> a dismissal under this paragraph is
> without prejudice.

Dismissal of a complaint without prejudice under Rule
41(a)(2) is within the discretion of the court. *Tolle v.
Carroll Touch, Inc.,* 23 F.3d 174, 177 (7th Cir.1994). "
'The district court abuses its discretion only when it can
be established [that] the defendant will suffer 'plain legal
prejudice' as the result of the district court's dismissal of
the plaintiff's action." ' *Kovalic v.. DEC Int'l, Inc.,* 855
F.2d 471, 473 (7th Cir.1988) (quoting *United States v.
Outboard Marine Corp.,* 789 F.2d 497, 502 (7th Cir.1986),
*cert. denied,* 479 U.S. 961 (1986)).

In determining whether the defendant will suffer "plain
legal prejudice" as a result of a dismissal without prejudice
under Rule 41(a)(2), the district court will consider the
following factors: "the defendant's efforts and expense of

PRISM Rehab Systems, Inc. v. Embassy Care Center, Inc., Not Reported in F.Supp.2d...

Case: 1:15-cv-06708 Document #: 89-1 Filed: 05/11/17 Page 12 of 60 PageID #:832

preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant." *Pace v. S. Express Co.,* 409 F .2d 331, 334 (7th Cir.1969).

*\*2* Under certain circumstances, a district court may, as a "term and condition" of dismissal, dismiss the action with prejudice. *Ratkovich v. Smith Kline,* 951 F.2d 155 (7th Cir.1991). However, "a plaintiff who moves for dismissal without prejudice under Rule 41(a)(2) must be given a reasonable opportunity to withdraw his motion in the event the district court grants the motion but only with prejudice." *Marlow v. Winston & Strawn,* 19 F.3d 300, 305 (7th Cir.1994).

The factors listed in *Pace* favor granting Plaintiffs' motion to dismiss the remaining counts without prejudice. Defendants have not expended significant effort or expense in preparing for trial. Discovery has not been completed, and no pre-trial submission or motions have been filed. Plaintiffs have not delayed the prosecution of these cases and have diligently prosecuted these cases. A twenty-month delay in ruling on Plaintiffs' motion for summary judgment occurred due to Defendants' substitution of counsel and attempt to enforce an alleged settlement agreement. After weighing the cost of continuing to litigate the cases and potential difficulty of collecting a judgment from one in the Defendants' precarious financial condition, Plaintiffs have decided to seek to voluntarily dismiss without prejudice the remaining counts. This explanation sufficiently explains the need for a dismissal without prejudice under Rule 41(a)(2). Finally, Defendants have not filed a motion for summary judgment.

Defendants argue that the actions should be dismissed with prejudice because they have been forced to defend the remaining counts for almost three years, and "it would be inequitable to empower [Plaintiffs] to institute new litigation regarding such claims ... in a different court, at any time it deems convenient ." (Defs.' Resp. Pls.' Mot. Dismiss at 1.) This argument is not persuasive. As was noted above, the delays in prosecuting these cases are attributable to Defendants' requests that the parties be given time to attempt to settle the cases, the withdrawal of Defendants' previous counsel, and Defendants' attempt to avoid partial summary judgment by asserting the existence of a settlement. Therefore, the remaining counts are dismissed without prejudice pursuant to Rule 41(a)(2).

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion to Dismiss All Remaining Counts Without Prejudice is granted. Counts II, III, V, VI, VIII and IX in Case No. 99 C 4104 and Counts II and III in Case No. 99 C 4513 are dismissed without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 992666

---

**End of Document**     © 2017 Thomson Reuters  No claim to original U.S. Government Works.

# EXHIBIT 4

2009 Copr.L.Dec. P 29,834, 92 U.S.P.Q.2d 1372

583 F.3d 948
United States Court of Appeals,
Sixth Circuit.

BRIDGEPORT MUSIC, INC.,
et al., Plaintiffs–Appellees,

v.

UNIVERSAL–MCA MUSIC PUBLISHING,
INC., et al., Defendants–Appellants.

Nos. 08–5254, 08–5255, 08–5256, 08–
5257, 08–5258, 08–5259, 08–5260, 08–
5261, 08–5262, 08–5263, 08–5264, 08–
5265, 08–5266, 08–5267, 08–5268, 08–
5269, 08–5270, 08–5271, 08–5272, 08–5273.

|

Argued: Oct. 8, 2009.

|

Decided and Filed: Oct. 21, 2009.

**Synopsis**
**Background:** Music and record companies brought action for copyright infringement relating to the use of samples in new rap recordings. After the action was severed and written discovery was exchanged in a number of cases, the companies moved to dismiss 20 of the cases without prejudice. The alleged infringers requested that the cases be dismissed with prejudice or that they be dismissed without prejudice on the condition that the companies be ordered to pay the alleged infringers' reasonable attorney fees and costs. The United States District Court for the Middle District of Tennessee granted the motions to dismiss without prejudice and ordered the parties to bear their own costs and fees. Alleged infringers appealed. The Court of Appeals, 481 F.3d 926, vacated and remanded. On remand, the District Court, Todd J. Campbell, Chief District Judge, adopted the opinions of Joe B. Brown, United States Magistrate Judge, 2008 WL 189894, 2008 WL 189895, 2008 WL 189898, 2008 WL 189900, 2008 WL 189902, 2008 WL 189903, 2008 WL 189935, 2008 WL 189936, 2008 WL 189938, 2008 WL 189966, 2009 WL 189967, 2008 WL 189968, 2008 WL 189971, 2008 WL 189983, 2008 WL 189985, 2008 WL 189988, 2008 WL 189992, and denied the alleged infringers' motion for attorney fees. Alleged infringers appealed.

**[Holding:]** The Court of Appeals, Ralph B. Guy, Jr., Circuit Judge, held that the District Court did not abuse its discretion in denying request for attorney fees as a condition of voluntary dismissal.

Affirmed.

West Headnotes (9)

**[1]** **Copyrights and Intellectual Property**
&#8631; Attorney fees

The fee shifting provisions of the Copyright Act allow an award of fees to prevailing defendants on equal footing with prevailing plaintiffs, but require the weighing of the nonexclusive *Fogerty* factors, including frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence. 17 U.S.C.A. § 101 et seq.

Cases that cite this headnote

**[2]** **Federal Courts**
&#8631; Dismissal or nonsuit in general

A district court's decisions with respect to a motion for voluntary dismissal are reviewed for abuse of discretion. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

9 Cases that cite this headnote

**[3]** **Federal Courts**
&#8631; Abuse of discretion in general

It is an abuse of discretion for the district court to rely on erroneous findings of fact, apply the wrong legal standard, misapply the correct legal standard, or make a clear error in judgment.

3 Cases that cite this headnote

**[4]** **Federal Courts**
&#8631; Reasons for decision

District court's explanation of its reasons for denying alleged infringers' request for

2009 Copr.L.Dec. P 29,834, 92 U.S.P.Q.2d 1372

attorney fees as a condition of voluntary dismissal without prejudice of 20 copyright infringement suits was sufficient to allow for appellate review, even though orders denying request were brief, where there was individual consideration of the cases, and each order adopted magistrate judge's findings and conclusions and explicitly denied the request. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

1 Cases that cite this headnote

**[5]**   **Copyrights and Intellectual Property**
    ⬅ Pleading
**Copyrights and Intellectual Property**
    ⬅ Attorney fees

District court did not abuse its discretion in denying alleged infringers' request for attorney fees as a condition of voluntary dismissal without prejudice of 20 copyright infringement cases brought by music and record companies; some cases were directly impacted by adverse decision rejecting one of companies' theories, explaining their decision to seek dismissal, the failed theory was objectively reasonable, delay in cases could not be attributed to the companies alone, and companies' cost-benefit analysis provided reasonable explanation for seeking dismissal. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

4 Cases that cite this headnote

**[6]**   **Federal Civil Procedure**
    ⬅ Nature and purpose

Purpose of the rule providing that an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper, is to protect the nonmovant from unfair treatment. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

28 Cases that cite this headnote

**[7]**   **Federal Civil Procedure**
    ⬅ Grounds and objections

Generally, an abuse of discretion is found with respect to a district court's decision under the rule providing that an action may be dismissed at the plaintiff's request only by court order on terms that the court considers proper only where the defendant would suffer plain legal prejudice as a result of a dismissal without prejudice, as opposed to facing the mere prospect of a second lawsuit. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

59 Cases that cite this headnote

**[8]**   **Federal Civil Procedure**
    ⬅ Grounds and objections

In determining whether plain legal prejudice would result to a defendant from the voluntary dismissal of an action without prejudice, courts typically consider the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary judgment has been filed by the defendant. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

53 Cases that cite this headnote

**[9]**   **Federal Civil Procedure**
    ⬅ Terms and Conditions

A voluntary dismissal without prejudice may be conditioned on whatever terms the district court deems necessary to offset the prejudice the defendant may suffer from a dismissal without prejudice. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

38 Cases that cite this headnote

**Attorneys and Law Firms**

**\*950   ARGUED:** Russell J. Frackman, Mitchell, Silberberg & Knupp LLP, Los Angeles, California, for Appellants. Richard S. Busch, King & Ballow, Nashville, Tennessee, for Appellees. **ON BRIEF:** Russell J. Frackman, Marc E. Mayer, Mitchell, Silberberg & Knupp LLP, Los Angeles, California, Philip M.

2009 Copr.L.Dec. P 29,834, 92 U.S.P.Q.2d 1372

Kirkpatrick, Dickinson Wright, Nashville, Tennessee, for Appellants. Richard S. Busch, King & Ballow, Nashville, Tennessee, for Appellees.

Before: MARTIN, GUY, and McKEAGUE, Circuit Judges.

## OPINION

RALPH B. GUY, JR., Circuit Judge.

Ten Universal-affiliated defendants, all record and music publishing companies, have appealed a second time from the district court's decision to deny the defendants' request that attorney fees be imposed as a condition of granting plaintiffs' motions to voluntarily dismiss without prejudice the twenty cases at issue pursuant to Fed.R.Civ.P. 41(a)(2). We remanded the matter after the first consolidated appeal "for a more detailed order specifically addressing the [defendants'] request for reasonable terms and conditions relating to the dismissal of [plaintiffs'] complaints." *Bridgeport Music, Inc. v. Universal–MCA Music Publishing, Inc.,* 481 F.3d 926, 927–28 (6th Cir.2007). Reviewing the orders entered after remand, we reject defendants' contention that the district court abused its discretion either by failing to provide specific reasons for its decision, or by deciding not to impose attorney fees as a condition of dismissal under Rule 41(a)(2). The judgments are affirmed.

## I.

[1] The claims involved in this appeal were originally asserted in a single action filed in May 2001 by the related entities Bridgeport Music, Southfield Music, Westbound Records, and Nine Records, alleging 500 separate counts of copyright infringement and various state law claims against approximately 800 defendants relating to the use of samples in new rap recordings. As many of our decisions have chronicled, the district court severed that action into 477 separate actions in August 2001 —106 of which were brought against one or more of the Universal-affiliated defendants. In February 2002, after a period of intensive litigation, the district court stayed the proceedings in all but ten **\*951** of the cases. While those first ten cases were vigorously litigated and appealed—including motions for attorney fees by prevailing defendants under 17 U.S.C. § 505—the rest of the cases were stayed except for a brief period to allow for settlement discussions in early 2003.[1]

The district court lifted the stay with respect to approximately 100 of the remaining cases in 2004— including the twenty cases at issue—for the limited purpose of allowing the exchange of written discovery. Specifically, the stay was lifted as to four of the twenty cases in March 2004, and as to the other sixteen cases in September 2004. Written discovery was exchanged in some of those cases, and plaintiffs offered to dismiss a number of the cases with prejudice under Rule 41(a) (1). Defendants would not stipulate to the dismissals, however, apparently because the district court had ruled in other *Bridgeport* cases that a voluntary dismissal with prejudice would not establish prevailing-defendant status for the purpose of seeking attorney fees. *See Bridgeport Music, Inc. v. London Music, U.K.,* 345 F.Supp.2d 836 (M.D.Tenn.2004), *aff'd* 226 Fed.Appx. 491 (6th Cir.2007) (affirming but expressly declining to decide whether voluntary dismissal with prejudice satisfied prevailing-party test).

On various dates between December 2004 and May 2005, plaintiffs filed motions to dismiss each of the twenty cases without prejudice and asked that the parties be ordered to bear their own costs and fees. Defendants opposed the motions and requested that the district court either (1) dismiss the complaints with prejudice and an explicit designation of defendants as "prevailing parties," or (2) dismiss the complaints without prejudice on the condition that plaintiffs be ordered to pay defendants' reasonable attorney fees and costs. Without holding a hearing or articulating its reasons, the district court entered twenty cursory orders granting plaintiffs' motions for voluntary dismissal without prejudice and stating that the parties would bear their own costs and fees.

Defendants appealed, and this court concluded that the district court's failure to articulate *any* reasons for its decision precluded appellate review for abuse of discretion. Vacating the judgments, the matter was remanded "for a more detailed order specifically addressing the [defendants'] request for reasonable terms and conditions relating to the dismissal of [plaintiffs'] complaints." 481 F.3d at 931. This court expressly noted, however, that the decision to remand was not meant to imply that the district court was wrong on the merits.

On remand, the cases were referred to a magistrate judge who was familiar with the litigation. Defendants filed a motion seeking attorney fees as a condition of dismissal under Rule 41(a)(2). Plaintiffs responded in opposition, and further briefing was provided with specific case-by-case analysis. After a full hearing, the magistrate judge recommended that the defendants' motions be denied. The magistrate judge, who noted his involvement in the litigation since its inception, observed that neither plaintiffs nor defendants had been particularly prompt, brief, or clear when **\*952** dealing with the discovery requests and responses. After identifying some of the factors to be considered, the magistrate judge explained as follows:

> The Magistrate Judge has closely reviewed each of the individual twenty cases and finds that Defendants should not be designated as prevailing parties and should not be awarded payment of attorneys' fees and costs incurred in defending the dismissed actions. The Magistrate Judge fully understands that each case is separate and fees and costs could be awarded in any one of them. However, the Magistrate Judge does not find distinguishing factors in any of these twenty cases. Contrary to the Defendants' contentions, prior to the *Rhyme Syndicate* decision in July 2004, Bridgeport had a reasonable basis for bringing these actions. [*Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615 (6th Cir.2004)]. Additionally, whether any use was *de minimis* was not raised in any successful motion for summary judgment. Further, in terms of any delay in dismissing these actions, neither side has covered themselves in glory when requesting and responding to discovery. Both sides could have acted quicker and spent less in prosecuting and defending these cases. Therefore, neither party has convinced the Magistrate Judge who is to blame for any delay. Also, while the Defendants repeat their defense mantra of "Bridgeport knew of the existence of prior licenses," the Magistrate Judge notes that the licenses themselves and the literally dozens of entities involved in their creation, ownership, and licensing of each composition make it difficult to determine who owns what without significant discovery taking place for clarification. Further, there was a lengthy stay in discovery in these actions. Additionally, Bridgeport's costs benefit analysis reasoning is a reasonable explanation for dismissal and there is no concrete evidence provided by the Defendants that Bridgeport's litigation strategies were inappropriate. In fact, the Defendants took a firm position that

they would litigate the cases. Lastly, while Defendants' supposition that they would have been the prevailing parties had the litigation continued is certainly possible, it is still mere speculation. As such, when reviewing the factors to be considered, the Magistrate Judge finds that the Defendants are not clearly prejudiced by these dismissals. Therefore, Defendants are not entitled to a designation as prevailing parties nor are they entitled [to] an award of attorney fees.

> The Magistrate Judge would note that the argument over fees should not become a secondary litigation that becomes more complex and expensive than the original litigation. The amount of resources the parties and the Court spent litigating over fees has now likely consumed more time and money than the original litigation. Undoubtedly there will be another trip to the Sixth Circuit by whoever loses this round of litigation. At some point, everyone is entitled to relief from more litigation after the dismissal of the original case at issue.

Defendants interposed objections, arguing—as they do now—that the magistrate judge failed to provide a sufficiently specific and detailed order, misapplied the legal standard, and clearly erred in considering and weighing the facts and circumstances of each case. The district court, in separate orders, overruled defendants' objections, adopted the magistrate judge's report and recommendation, and denied defendants' motion for attorney fees in each of the twenty cases at issue. These consolidated appeals followed.

## **\*953** II.

**[2]** **[3]** When an answer or a motion for summary judgment has been served, and not all of the parties who have appeared will stipulate to dismissal, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." FED.R.CIV.P. 41(a)(2) (2007). [2] Unless the order states otherwise, a dismissal under Rule 41(a)(2) is without prejudice. *Id.* A district court's decisions with respect to a motion for voluntary dismissal under Rule 41(a)(2) are reviewed for abuse of discretion. *DWG Corp. v. Granada Invs., Inc.*, 962 F.2d 1201, 1202 (6th Cir.1992); *Grover by Grover v. Eli Lilly and Co.*, 33 F.3d 716, 718 (6th Cir.1994); *see also Duffy v. Ford Motor Co.*, 218 F.3d 623, 629 (6th Cir.2000) (stating that conditions placed on a Rule 41(a)

Bridgeport Music, Inc. v. Universal-MCA Music Pub., Inc., 583 F.3d 948 (2009)
2009 Copr.L.Dec. P 29,834, 92 U.S.P.Q.2d 1372

(2) dismissal are reviewed for abuse of discretion). It is an abuse of discretion for the district court to rely on erroneous findings of fact, apply the wrong legal standard, misapply the correct legal standard, or make a clear error in judgment. *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir.2006).

**[4]** At the outset, defendants argue that the district court abused its discretion by failing once again to sufficiently explain its reasons—on a case-by-case basis—for not requiring the payment of defendants' attorney fees as a condition of dismissal under Rule 41(a)(2). This argument both misreads our prior decision and mischaracterizes the district court's decision. Our remand was based on a determination that the district court's implicit denial of defendants' requests for attorney fees without articulating *any* reasons for the denial precluded review under the abuse-of-discretion standard. 481 F.3d at 930–31. We said that, as in *DWG:* " 'The difficulty we face is that the court's silence prohibits us from examining the soundness of its discretionary judgment. There may well be convincing reasons for denying the motion for costs. But unless such grounds are made explicit we cannot know for sure.' " 481 F.3d at 930 (quoting *DWG,* 962 F.2d at 1202). Although the district court's orders on remand remained brief, each order adopted the magistrate judge's findings and conclusions and explicitly denied defendants' request that attorney fees be imposed as a condition of dismissal under Rule 41(a)(2). We have no difficulty concluding that there was individual consideration of the cases and that the record is sufficient to allow appellate review of the soundness of the district court's exercise of its discretion.

**[5]  [6]  [7]  [8]  [9]**  Turning to the merits, the purpose of Rule 41(a)(2) is to protect the nonmovant, here the defendants, from unfair treatment. *Grover,* 33 F.3d at 718. "Generally, an abuse of discretion is found only where the defendant would suffer 'plain legal prejudice' as a result of a dismissal without prejudice, as opposed to facing the mere prospect of a second lawsuit." *Id.* (citation omitted). In determining whether such prejudice would result, courts typically consider "the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary judgment has been filed by the defendant." *Id.; see also Doe v. Urohealth* *954 *Sys., Inc.,* 216 F.3d 157, 160 (1st Cir.2000). A Rule 41(a)(2) dismissal may be

conditioned on whatever terms the district court deems necessary to offset the prejudice the defendant may suffer from a dismissal without prejudice. *LeBlang Motors, Ltd. v. Subaru of Am., Inc.,* 148 F.3d 680, 685 (7th Cir.1998); *McCants v. Ford Motor Co.,* 781 F.2d 855, 856 (11th Cir.1986).

While such conditions often involve the payment of costs incurred by a defendant, this court has expressly rejected the contention that the payment of defense costs is universally required for voluntary dismissal under Rule 41(a)(2). Specifically, in *DWG,* the defendant relied "on what it describe[d] as a nearly universal requirement that voluntary dismissals are to be accompanied by payment of defense costs." 962 F.2d at 1202. This court held, however, that: "In fact, no such requirement or rule exists in this or in any other Circuit. Although courts frequently impose defense costs on plaintiffs granted a voluntary dismissal, no circuit court has held that such costs are mandatory." *Id.* (citing *Stevedoring Servs. of Am. v. Armilla Intern.,* 889 F.2d 919, 921 (9th Cir.1989)). Likewise, we resist defendants' suggestion in this case that courts should necessarily require payment of defense costs before allowing a plaintiff to dismiss under Rule 41(a)(2). Nor are we persuaded that it was an abuse of discretion for the district court to decide not to require payment of defendants' costs in these cases.

Defendants specifically argue that the district court failed to heed this court's rejection of a "one-size-fits-all" explanation for plaintiffs' motions to dismiss these cases under Rule 41(a)(2). Actually, this court rejected the plaintiffs' argument that the adverse decision in *Rhyme Syndicate* could be a substitute for the district court's articulation of its reasons—particularly since the plaintiffs had conceded that only fifteen of the twenty cases at issue were "directly impacted" by the rejection of plaintiffs' royalty-receipt theory. We asked, "What about the other five cases?" Although the findings on remand did not specify which cases were impacted by the *Rhyme Syndicate* decision, it was not an abuse of discretion to reiterate that —as we have also held—the failed theory was objectively reasonable. *Bridgeport Music, Inc. v. WB Music Corp.,* 520 F.3d 588, 594 (6th Cir.2008); *Bridgeport Music, Inc. v. Rhyme Syndicate Music,* 376 F.3d 615, 628–29 (6th Cir.2004). Even defendants do not dispute that the adverse ruling directly impacted fifteen of the cases, explaining plaintiffs' decision to seek dismissal. Finally, this finding

was only part of the rationale adopted by the district court on remand.

Focusing on the other five cases, defendants seem to argue that the claims were not objectively reasonable because one case involved claims subject to a prior settlement agreement; defendants denied owning or administering the allegedly infringing work in two cases; and there were licenses that defendants argued would bar the claims in the other two cases. Plaintiffs responded that the settlement was a matter of contention, that there was an evidentiary basis to believe that defendants had administered the infringing works notwithstanding their denials, and that the licenses defendants relied upon had never been fully executed. It would be speculative to conclude that defendants would have prevailed on a motion for summary judgment when no motion for summary judgment was pending, and plaintiffs had—at the district court's urging—weighed the costs and benefits of continuing to litigate these cases. Nor have defendants shown that it was clear error to find that some discovery was appropriate in order to determine the significance **\*955** of the licenses on which defendants relied as a bar to the infringement claims.

Defendants also claim that the district court abused its discretion by not considering whether plaintiffs should have dismissed their claims sooner, by failing to analyze the prejudice to defendants, and by giving weight to the defendants' litigation conduct. On the contrary, the district court specifically considered whether there was excessive delay on the part of plaintiffs, and concluded not only that the delay in these cases could not clearly be attributed to plaintiffs alone, but also that plaintiffs' cost-benefit analysis provided a reasonable explanation for seeking dismissal in these cases. Our familiarity with other cases arising out of this litigation confirms our determination that the district court considered these cases individually and did not abuse its discretion in finding that defendants would not suffer prejudice requiring the payment of a pro rata share of attorney fees as a condition for dismissal under Rule 41(a)(2).

**AFFIRMED.**

**All Citations**

583 F.3d 948, 2009 Copr.L.Dec. P 29,834, 92 U.S.P.Q.2d 1372

---

Footnotes

1    The fee shifting provisions of the Copyright Act allow an award of fees to prevailing defendants on equal footing with prevailing plaintiffs, but requires the weighing of the *Fogerty* factors discussed and applied with varying results in five prior appeals. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) ( "nonexclusive" factors include frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence).

2    Rule 41(a)(2), which was amended effective December 1, 2007, previously provided that except as provided for in Rule 41(a)(1), "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." The Advisory Committee Notes indicate that the 2007 amendments to Rule 41 were intended to be stylistic only.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

KeyCite Yellow Flag - Negative Treatment
Distinguished by Spar Gas. Inc. v. AP Propane, Inc., 6th Cir.(Tenn.),
July 22, 1992

962 F.2d 1201
United States Court of Appeals,
Sixth Circuit.

DWG CORPORATION, Third–
Party Plaintiff–Appellee,
v.
GRANADA INVESTMENTS, INC., et al.,
Counterdefendants and Third–Party Defendants,
Fairview Financial Corporation, G.H.
Enterprises, Inc., Peter F. Pellulo, Global
Financial Corporation, and Leonard A.
Pellulo, Third–Party Defendants–Appellants.

No. 91–3298.
|
Argued Feb. 20, 1992.
|
Decided April 30, 1992.

In securities fraud litigation, the United States District Court for the Northern District of Ohio, Thomas D. Lambros, Chief Judge, granted third-party plaintiff's motion for voluntary dismissal and denied costs. Defendant appealed. The Court of Appeals held that: (1) imposition of defense costs on grant of voluntary dismissal was not mandatory, and (2) district court's silence as to its reasons for rejecting defendant's motion for costs and attorney fees required remand.

Remanded.

West Headnotes (2)

[1] **Federal Civil Procedure**
↦ Payment of costs and expenses
Imposition of defense costs on plaintiffs granted voluntary dismissal was not mandatory. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

23 Cases that cite this headnote

[2] **Federal Courts**
↦ Determination of damages, costs, or interest;remittitur
District court's silence as to its reasons for rejecting defendant's motion for costs and attorney fees upon voluntary dismissal of plaintiff's complaint required remand; court's silence prohibited Court of Appeals from examining soundness of its discretionary judgment. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

25 Cases that cite this headnote

**Attorneys and Law Firms**

*1201 Dennis J. Block (argued), Irwin H. Warren, Weil, Gotshal & Manges, New York City; Norman S. Jeavons (briefed), Wayne C. Dabb, Thomas H. Shunk, Baker & Hostetler, Cleveland, Ohio; Lawrence A. Blatte, Kevin P. Groarke, Martin Rosen, Henry W. Hocherman, Rosen & Reade, New York City; Daniel P. Mascaro, Cleveland, Ohio; Paul P. Eyre, Cleveland Heights, Ohio; and John P. Witri, Lakewood, Ohio, for plaintiff-appellee.

Anthony G. Covatta (argued and briefed), Graydon, Head & Ritchey, Cincinnati, Ohio, for defendants-appellants.

*1202 Before: RYAN and SUHRHEINRICH, Circuit Judges; and CHURCHILL, Senior District Judge.*

ORDER

This case arises out of the securities fraud litigation consolidated and heard separately in *Granada v. DWG,* 962 F.2d 1203. The present matter is an appeal by third-party defendants ("the Pellulo group") from a district court order granting third-party plaintiff DWG's motion for voluntary dismissal of claims against the Pellulo group. Fed.R.Civ.P. 41(a)(2). The order was silent regarding the Pellulo group's motion for costs and attorney fees.

[1] Two issues are presented. First, the Pellulo group relies on what it describes as a nearly universal requirement that voluntary dismissals are to be accompanied by payment of defense costs. In fact, no such requirement or rule exists in this or in any other

Circuit. Although courts frequently impose defense costs on plaintiffs granted a voluntary dismissal, no circuit court has held that such costs are mandatory. *Stevedoring Services of America v. Armilla Intern.*, 889 F.2d 919, 921 (9th Cir.1989). As a matter of law, then, defense costs need not be awarded.

[2]   Second, the Pellulo group assigns error to the district court's muteness on their motion for attorney fees. The dismissal of a plaintiff's complaint under Fed.R.Civ.P. 41(a)(2) is within the sound discretion of the court and is reversible only for abuse of discretion.

The difficulty we face is that the court's silence prohibits us from examining the soundness of its discretionary judgment. There may well be convincing reasons for denying the motion for costs. But unless such grounds are made explicit we cannot know for sure.

A nearly identical situation confronted the D.C. Circuit in *Taragan v. Eli Lilly and Co., Inc.*, 838 F.2d 1337 (D.C.Cir.1988). In *Taragan,* the district court failed to explain why it rejected appellant's motion to condition the dismissal on payment of attorney fees. The appellate court —unable to evaluate the district court's thinking in order to determine abuse of discretion—remanded the case for a fuller statement of reasons. *Id.* at 1339. *See also McCants v. Ford Motor Co.*, 781 F.2d 855 (11th Cir.1986) (court was unable to evaluate the district court's exercise of discretion without a record of the factors it took into consideration).

We regard *Taragan*'s reasoning as controlling here. In order to assess the court's discretion we require some evidence of the content of its reasoning. The case is remanded to the district court for a more complete statement of the court's reasons for rejecting the Pellulo group's motion for costs and fees.

**All Citations**

962 F.2d 1201

**Footnotes**

\*         The Honorable James P. Churchill, United States Senior District Judge for the Eastern District of Michigan, sitting by designation.

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Taragan v. Eli Lilly and Co., Inc., D.C.Cir.,
February 12, 1988

819 F.2d 1270
United States Court of Appeals,
Fourth Circuit.

Nannette B. DAVIS, Plaintiff-Appellant,

v.

USX CORPORATION, Defendant-Appellee.

No. 86-3705.
|
Argued Feb. 3, 1987.
|
Decided June 3, 1987.

Employee brought sexual discrimination action against employer based on harassment by coemployee. The United States District Court for the District of South Carolina, Clyde H. Hamilton, J., granted summary judgment in favor of employer on common-law claims, and plaintiff appealed. The Court of Appeals, 779 F.2d 209, reversed and remanded. On remand, the District Court denied employee's motion for voluntary dismissal and dismissed complaint with prejudice, and appeal was taken. The Court of Appeals, Harrison L. Winter, Chief Judge, held that: (1) district court abused its discretion by denying motion for voluntary dismissal based on employee's refusal to comply with condition limiting causes of action plaintiff could pursue in state court, and (2) district court abused its discretion denying motion for voluntary dismissal without prejudice because employee refused to pay portion of employer's attorney fees arising out of litigation in federal court.

Reversed and remanded.

James Dickson Phillips, Circuit Judge, filed dissenting opinion.

West Headnotes (5)

[1]     **Federal Civil Procedure**
        ⬥ Order
        Rule governing voluntary dismissals, except dismissal before service or answer or dismissal by stipulation, requires court order as prerequisite to dismissal and permits district court to impose conditions on voluntary dismissal to obviate any prejudice to defendants which may otherwise result from dismissal without prejudice. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

        145 Cases that cite this headnote

[2]     **Federal Civil Procedure**
        ⬥ Motion and Proceedings Thereon
        When considering motion for voluntary dismissal, court must focus primarily on protecting interest of defendant. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

        72 Cases that cite this headnote

[3]     **Federal Civil Procedure**
        ⬥ Grounds and Objections
        Possibility that plaintiff will gain tactical advantage over defendant in future litigation is insufficient basis for denying motion for voluntary dismissal. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

        59 Cases that cite this headnote

[4]     **Federal Civil Procedure**
        ⬥ Terms and Conditions
        Mere prospect that employee would pursue her state law claims in state court based upon employer's imputed liability for coemployee's actions after date that coemployee's supervisor observed them under theory of respondeat superior was not prejudicial to defendant for purposes of denying motion for voluntary dismissal, where Court of Appeals had never addressed issue of appropriate cause of action under South Carolina law by which liability could be impugned to employer; thus, district court abused its discretion in denying motion for voluntary dismissal based upon employee's refusal to comply with condition limiting causes of action employee could pursue in

Case: 1:15-cv-06708 Document #: 89-1 Filed: 05/11/17 Page 25 of 60 PageID #:832

**Davis v. USX Corp., 819 F.2d 1270 (1987)**

43 Fair Empl.Prac.Cas. (BNA) 1685, 43 Empl. Prac. Dec. P 37,163, 8 Fed.R.Serv.3d 74...

state court. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

136 Cases that cite this headnote

**[5]     Federal Civil Procedure**
          ↪ Payment of Costs and Expenses
          Requirement that employee pay portion of employer's attorney fees as condition for voluntary dismissal of federal case so that plaintiff could pursue litigation in state court was abuse of discretion, where work and resources expended during federal litigation would easily be carried over to litigation in state court, and federal discovery would be usable in state forum. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

          40 Cases that cite this headnote

**Attorneys and Law Firms**

*1271 Wilmot Brown Irvin (R.W. Dibble, Jr., McNair Law Firm, P.A., Columbia, S.C., on brief), for plaintiff-appellant.

Richard Fleming Lerach, for defendant-appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge and BUTZNER, Senior Circuit Judge.

**Opinion**

HARRISON L. WINTER, Chief Judge:

Plaintiff Nannette B. Davis sued her employer USX Corporation (formerly United States Steel Corp.) asserting claims under the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 *et seq.*, (title VII) and several pendent state law causes of action, including assault and battery and intentional infliction of emotional distress. Davis alleges that she was sexually harassed by her boss, Jim Bryan, while she was employed by USX at a facility in Bamberg, South Carolina. We heard one previous appeal of this action in which we reversed the district court's order of summary judgment for USX. *Davis v. United States Steel Corp.,* 779 F.2d 209 (4 Cir.1985). Upon remand to the district court following that decision, Davis filed a motion for voluntary dismissal without prejudice pursuant to F.R.Civ.P. 41(a)(2). After Davis

refused to accept certain conditions imposed by the district court on her motion for voluntary dismissal, the motion was denied. The district court subsequently dismissed the plaintiff's action with prejudice in July of 1986. The plaintiff appeals, challenging, among other things, the district court's order denying the motion for voluntary dismissal. We reverse.

I.

After the plaintiff filed her suit against USX, the case progressed until the district court granted summary judgment in favor of USX on the plaintiff's state common law claims. The district court ruled that South Carolina law does not recognize a theory which imputes liability to USX for the actions of its employee Bryan. Davis then dismissed her title VII claim in order to appeal the district court's decision on her state law claims. At the same time, Davis filed suit against USX and Bryan in South Carolina state court alleging claims of assault and battery, intentional infliction of emotional distress, and invasion of privacy. Davis sought recovery against USX on these claims in her state court action based on a respondeat superior theory which would impute Bryan's actions to USX for the purposes of determining USX's liability to Davis.

On appeal of the district court's summary judgment order, a divided panel of this court reversed. Davis had alleged that sometime during July of 1981, Bryan's superviser, Jim Stoutz, knew or should have known that Davis was the victim of offensive *1272 sexual conduct on the part of Bryan. In August of 1981, Stoutz, on behalf of USX, conducted an investigation of the allegations of Bryan's misconduct in response to complaints by Davis, but took no action against Bryan. Based on these allegations, we reversed and remanded to the district court to allow Davis to pursue her state law claims against USX for Bryan's actions after the date that USX's supervisory employee, Stoutz, became aware of those actions.

In that decision, Judge Murnaghan, with Judge Butzner concurring and Judge Phillips dissenting, held that Davis could present a case permitting the factfinder to establish that the observations and inaction of United States Steel's supervisory employee, Stoutz, should be imputed to the company. *Id.* at 211. Judge Murnaghan, this time with Judge Phillips concurring and Judge Butzner dissenting,

also concluded that under South Carolina law, USX was not liable for Bryan's actions which occurred prior to the date when Stoutz first observed Bryan's reprehensible behavior. *Id.* Judge Butzner filed a separate opinion, concurring in part and dissenting in part. He expressed the view that USX could be held liable under South Carolina law for Bryan's acts that occurred before and after the date that Stoutz observed them. *Id.* at 212-13. Judge Phillips also wrote a separate opinion, concurring in part and dissenting in part, to state his view that under South Carolina law, the plaintiff's allegations were insufficient to impute liability for Bryan's actions to USX at any time. *Id.* at 213-15.

After the case was remanded to the district court for further proceedings, Davis filed a motion for voluntary dismissal without prejudice pursuant to F.R.Civ.P. 41(a)(2) because she planned to pursue her common law claims in the action which she had filed in state court.[1] In considering the motion, the district court was primarily concerned that Davis should not be allowed to pursue her common law claims against USX other than on a theory of negligent supervision. The district court's view in this regard was based on its reading of our previous opinion in this case which it felt limited the plaintiff to a cause of action for negligent supervision. The district court imposed four conditions to which Davis was to agree before the motion would be granted:

(1) Payment of a reasonable portion of USX's costs and attorneys' fees for the litigation Davis pursued in federal court.

(2) Agreement that the discovery material developed in federal court could be used in the state court proceeding.

(3) Agreement not to pursue the state law claims against USX on a theory of respondeat superior in state court.

(4) Agreement that the only cause of action that Davis would pursue against USX in the state court action would be the negligent failure of USX to supervise Bryan after the date Stoutz observed Bryan's improper behavior against the plaintiff.

Because Davis refused to agree to meet these conditions, her motion for voluntary dismissal was denied.

Subsequently, Davis renewed a previous motion to amend her federal complaint to assert a cause of action for invasion of privacy. The district court denied the motion on April 10, 1986, on the ground that USX was not liable for the plaintiff's common law claims under the doctrine of respondeat superior. At a hearing on June 23, the district court issued a ruling excluding all evidence that Bryan harassed Davis prior to the date that Stoutz first became aware of this harassment.

In another pretrial ruling, the district court also ordered that the plaintiff could proceed to trial solely on a cause of action against USX for its negligent supervision of Bryan after the date that Stoutz became aware of Bryan's harassment of Davis. The initial effect of this ruling was to limit the damages which the plaintiff was entitled to recover at trial because, under ***1273** South Carolina law, a plaintiff may not recover damages for mental anguish or emotional distress based on a cause of action for negligent supervision. *Dooley v. Richland Memorial Hospital,* 283 S.C. 372, 322 S.E.2d 669 (1984); *Padgett v. Colonial Wholesale Distributing Co.,* 232 S.C. 593, 103 S.E.2d 265 (1958). Then, on July 3, 1986, Davis informed the district court that she had no evidence that she was physically injured by Bryan's misconduct. The parties thus stipulated to dismissal with prejudice of the plaintiff's cause of action against USX for negligent supervision. With no claim left for the plaintiff to bring to trial, the district court dismissed the plaintiff's action against USX on July 9, 1986. This appeal followed.

## II.

Rule 41(a)(2) allows a plaintiff, with the approval of the court, to dismiss voluntarily an action without prejudice at any time. Rule 41(a)(2) provides in pertinent part:

> Except as provided in paragraph (1) of this subdivision of this rule [dismissal before service or answer or dismissal by stipulation], an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper.... Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

The decision to grant a voluntary dismissal under Rule 41(a)(2) is a matter for the discretion of the district court, and its order will ordinarily not be reversed except for an abuse of discretion. *McCants v. Ford Motor Co.,* 781 F.2d 855, 857 (11 Cir.1986); *Kenrose Mfg. Co. v. Fred Whitaker Co.,* 512 F.2d 890, 895 (4 Cir.1972).

**[1]  [2]**  The purpose of Rule 41(a)(2) is freely to allow voluntary dismissals unless the parties will be unfairly prejudiced. *McCants, supra,* 781 F.2d at 856; *Alamance Industries Inc. v. Filene's,* 291 F.2d 142, 146 (1 Cir.1961), *cert. denied,* 368 U.S. 831, 82 S.Ct. 53, 7 L.Ed.2d 33 (1961). To fulfill this purpose, Rule 41(a)(2) requires a court order as a prerequisite to dismissal and permits the district court to impose conditions on voluntary dismissal to obviate any prejudice to the defendants which may otherwise result from dismissal without prejudice. In considering a motion for voluntary dismissal, the district court must focus primarily on protecting the interests of the defendant. *McCants, supra,* 781 F.2d at 856; *Hoffman v. Alside, Inc.,* 596 F.2d 822, 823 (8 Cir.1979); *LeCompte v. Mr. Chip, Inc.,* 528 F.2d 601, 604 (5 Cir.1976).

The district court in this case considered two types of prejudice faced by USX in the event of dismissal: the fact that the plaintiff would pursue her state law claims against USX under a theory of respondeat superior in state court, and the significant resources expended by the defendant during the litigation of the plaintiff's claim in federal court. We will address both of these issues seriatim.

## A.

The district court concluded that pursuit of the plaintiff's common law claims in state court would unfairly prejudice USX because USX's liability under a theory of respondeat superior was foreclosed by our previous opinion in this case. We did not in that opinion, nor do we today, intend to address the issue of the appropriate cause of action under South Carolina law by which liability for Bryan's acts could be imputed to USX, after the date that Stoutz gained knowledge of Bryan's acts. We merely held in our previous decision that South Carolina would allow liability for Bryan's actions to be imputed to USX after the date that Stoutz observed Bryan's notorious acts.

Upon remand of our previous decision, the question arose of what cause of action South Carolina law would allow based on USX's imputed liability for the acts of its employee. Under the doctrine of respondeat superior, USX may be liable for the acts of its employee which were *within* the scope of his employment. Prosser, Law of Torts § 70 (1971); Restatement (Second) of Agency § 228(i) (1980). Under a theory of negligent supervision, USX may be held **\*1274** liable for a failure to exercise reasonable care to control an employee from intentionally harming third parties while acting *outside* the scope of his employment. Restatement (Second) of Torts § 317 (1964). The scope of an employer's liability for negligent supervision is thus broader than the liability imputed to an employer under a theory of respondeat superior. The South Carolina courts have not clarified the scope of vicarious liability of an employer for the acts of its employees under South Carolina law under either of these theories of liability. *See Crittenden v. Thompson-Walker Co.,* 288 S.C. 112, 341 S.E.2d 385 (1986). But, under a theory of negligent supervision, South Carolina does not permit a plaintiff to recover damages for mental suffering. *Supra.*

If our previous opinion had established the scope of USX's imputed liability to the plaintiff, the district court's order conditioning dismissal upon the plaintiff's agreement not to assert claims barred by the law of the case would have been entirely proper. *See Pace v. Southern Express Agency,* 409 F.2d 331, 334 (7 Cir.1969) (denial of voluntary dismissal is appropriate where summary judgment is imminent); 5 Moore's Federal Practice ¶ 41.05[1] (1986). In our previous opinion, however, the question of whether the plaintiff was to proceed against USX based on its imputed liability for the acts of Bryan under a cause of action based on respondeat superior or negligent supervision was not squarely presented. While our discussion of USX's imputed liability for the acts of its employee Bryan occasionally made reference to different theories of vicarious liability, these references were not intended to decide this question. [2] Because neither of these theories of imputed liability was foreclosed by the law of the case as set forth in our previous panel opinion, the district court should have granted the plaintiff's motion for voluntary dismissal without prejudice so that the plaintiff would have the opportunity to litigate this question in state court, with regard to Bryan's actions after they became known to Stoutz. *Cf. Smith v. Bounds,* 813

F.2d 1299 (4 Cir.1987) (law of the case does not govern issues which the appellate court did not address). [3]

[3] It is well established that, for purposes of Rule 41(a) (2), prejudice to the defendant does not result from the prospect of a second lawsuit. *McCants, supra,* 781 F.2d at 857; *Hamilton v. Firestone Tire &* **\*1275** *Rubber Co.,* 679 F.2d 143, 145 (9 Cir.1982); *Home Owner's Loan Corp. v. Huffman,* 134 F.2d 314, 317 (8 Cir.1943); 5 Moore's Federal Practice, *supra,* at ¶ 41.05[1]. Moreover, the possibility that the plaintiff will gain a tactical advantage over the defendant in future litigation will not serve to bar a second suit. *Id.* Thus, in this case, the mere prospect of the transfer of litigation to state court was an insufficient basis for denying the motion for voluntary dismissal. "Ordinarily the mere fact that a plaintiff prefers the state courts ought not to prevent his discontinuing his suit; one court is as good as another." *Young v. Southern Pacific Co.,* 25 F.2d 630, 632 (2 Cir.1928) (Learned Hand, J., concurring).

Indeed, in cases involving the scope of state law, courts should readily approve of dismissal when a plaintiff wishes to pursue a claim in state court. In this case, for example, a lawsuit in state court is preferable because it would allow the courts of South Carolina to resolve a difficult question of state law. *Cf. Lehman Brothers v. Schein,* 416 U.S. 386, 390-91, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974) (certification of questions of state law by the federal courts "does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism"). It must also be remembered that, absent compelling reasons or the consent of the parties, a district court's decision to condition dismissal on plaintiff's agreement not to assert state law claims in state court may unduly burden a plaintiff's right of access to such courts. Imposition of conditions limiting a plaintiff's recourse to the state courts may also be an affront to principles of comity because such conditions may usurp the authority of the state courts to resolve questions of state law. *See Oklahoma Packing Co. v. Oklahoma Gas & Elec. Co.,* 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 537 (1940) ("obviously this dual system could not function if state and federal courts were free to fight each other for control of a particular case"). *Cf. Younger v. Harris,* 401 U.S. 37, 44-45, 91 S.Ct. 746, 750-51, 27 L.Ed.2d 669 (1971) (discussing principles of comity).

These principles are well established. In *Durham v. Florida East Coast Railway Co.,* 385 F.2d 366 (5 Cir.1967), the plaintiff sought voluntary dismissal after three weeks of trial in order to start the litigation anew because the plaintiff's motion to amend his complaint to account for newly discovered evidence had been denied as untimely. The Fifth Circuit reversed the order of the district court denying dismissal because the record failed to disclose "any prejudice to the defendant ... other than the annoyance of a second litigation upon the same subject matter." *Id.* 385 F.2d at 369. *See also Holiday Queen Land Corp. v. Baker,* 489 F.2d 1031 (5 Cir.1974) (district court abused its discretion by refusing to dismiss action without prejudice due to prospect of second suit despite contention by the defendant that the subsequent suit would be frivolous). Most recently, in *McCants, supra,* the Eleventh Circuit held that it was not an abuse of discretion for the district court of Alabama to dismiss voluntarily a suit without prejudice even though the plaintiff intended to refile his claim in the state courts of another state in order to escape the bar of Alabama's statute of limitations. The court concluded that the loss of a valid statute of limitations defense does not constitute a bar to dismissal under Rule 41(a)(2). 781 F.2d at 859. [4] Thus, in this case, the fact that dismissal **\*1276** will subject USX to South Carolina law as interpreted by the courts of South Carolina if dismissal is allowed is not prejudicial to USX under the analysis called for by Rule 41(a)(2). *See also Clubb v. General Motors Corp.,* 14 F.R.Serv 2d 1434 (4 Cir.1971) (allegations of forum shopping are insufficient to support denial of motion for voluntary dismissal).

[4] Thus, we hold that the mere prospect that the plaintiff in this case would pursue her state law claims in state court based on USX's imputed liability for Bryan's actions after the date Stoutz observed them under a theory of respondeat superior is not prejudicial to the defendant for purposes of Rule 41(a)(2). Moreover, there is no evidence that the plaintiff has proceeded in bad faith during the litigation in federal court or in filing her action in state court. *See McCants, supra,* 781 F.2d at 859. Thus, the district court abused its discretion by denying the motion for voluntary dismissal based on the plaintiff's refusal to comply with a condition limiting the causes of action the plaintiff could pursue in state court to a cause of action for negligent supervision.

Case: 1:15-cv-06708 Document #: 89-1 Filed: 05/11/17 Page 29 of 60 PageID #:832
**Davis v. USX Corp., 819 F.2d 1270 (1987)**

43 Fair Empl.Prac.Cas. (BNA) 1685, 43 Empl. Prac. Dec. P 37,163, 8 Fed.R.Serv.3d 74...

### B.

The district court also imposed certain conditions on the motion for voluntary dismissal in order to alleviate prejudice to the defendant from the inconvenience and resources expended on the litigation of the plaintiff's action in federal court. To remedy this prejudice, the district court conditioned dismissal on the plaintiff's payment of a portion of USX's costs and attorneys' fees incurred in the federal litigation and on agreement that the discovery material developed in federal court could be used in the state court proceedings.

We find no abuse of discretion in the requirements that the plaintiff pay a portion of USX's taxable costs and agree to the use of discovered materials in any state court proceeding. Such conditions should be imposed as a matter of course in most cases. Wright & Miller, Federal Practice and Procedure § 2366; Moore's Federal Practice, *supra*. Nor has the plaintiff raised any real challenge to these terms for dismissal.

[5] The requirement that the plaintiff pay a portion of USX's attorneys' fees is another matter, however. It is evident from the record that the work and resources expended to date during this litigation will be easily carried over to litigation of the plaintiff's cause of action in state court. There is no basis, therefore, for concluding that the defendant will be prejudiced by a failure to impose this condition on the plaintiff, especially when federal discovery will be useable in the state forum. *See Tyco Laboratories Inc. v. Koppers Co.*, 627 F.2d 54, 56 (7 Cir.1980) (extensive discovery is not prejudicial where evidence discovered may be used in subsequent action). Nor do we find that the plaintiff has acted in bad faith in seeking dismissal under 41(a)(2) so as to warrant such a condition. *Supra.* Thus, we further hold, under the facts of this case, that the district court abused its discretion by denying the motion for voluntary dismissal without prejudice because of the plaintiff's refusal to pay a portion of the defendant's attorneys' fees arising from the litigation of this action in federal court.

### III.

The plaintiff in this appeal also challenges the district court's orders denying her motion to amend her complaint, excluding evidence that may be introduced at trial that Bryan harassed the plaintiff prior to the date that Stoutz became aware of this harassment, and limiting the claims of action at trial under which the plaintiff could recover to a theory of negligent supervision. We need not decide these issues because, having decided that the plaintiff's motion for voluntary dismissal should be granted on terms which are agreeable to the plaintiff, these questions should be addressed by the state courts of South Carolina.

### REVERSED AND REMANDED.

JAMES DICKSON PHILLIPS, Circuit Judge, dissenting:

I respectfully dissent. Under the circumstances of this case, I do not think the *1277 district court abused its discretion in imposing all of the conditions to allowing Davis to dismiss her federal action without prejudice. In particular, I disagree with the majority's conclusion that it was an abuse of discretion to impose the condition that Davis must limit her state law action to claims of negligent supervision after Stoutz (hence USX by imputation) became aware of Bryan's alleged tortious conduct.

I accept the majority's careful and complete statement of the general legal principles controlling the allowance of dismissals without prejudice under Fed.R.Civ.P. 41(a)(2). In particular, I agree with the recognition, op. 1274, that dismissal without prejudice may properly be conditioned upon a claimant's limiting her prosecution of claims in other courts to those not already adversely determined or faced with imminent adverse determination in the federal action. *See generally* 5 Moore's Federal Practice ¶ 41.05[1] (1986). That wise principle simply recognizes that it is unfair to a defendant to let a claimant select a forum in which to prosecute her claims, then be allowed to bail out scot-free to try the same claims in another forum after losing on the merits or seeing the adverse handwriting on the wall in the first chosen forum.

The majority finds that principle not applicable here, however, because in its view the claims sought to be precluded by the imposition of a condition had not been adversely determined (become the "law of the case") in the federal action. With all deference, I simply disagree with that analysis.

Whatever the uncertainties resulting from the three-way division, our earlier panel decision clearly held, applying South Carolina law on the authority of our earlier decision in *Rabon v. Guardsmark, Inc.,* 571 F.2d 1277 (4th Cir.1978), that an employer is not liable for the intentional torts of its employee not committed in furtherance of the employer's business and that, on the facts here, this precluded Davis' recovery for Bryan's reprehensible conduct. *See Davis v. United States Steel Corp.,* 779 F.2d 209, 211-12 (4th Cir.1985). The majority opinion here finds this holding limited to the period of time before Stoutz (hence USX) learned of Bryan's tortious conduct.[1]

This, with all respect, misinterprets the legal significance of the earlier panel decision's holding that Davis could proceed with a direct claim against USX for *its* "negligent supervision" of Bryan once USX knew (through Stoutz) of Bryan's earlier conduct. That holding cannot properly be understood also to open up a parallel respondeat superior claim based directly upon Bryan's conduct *after that time.* Respondeat superior liability does not depend upon whether an employer knows (either directly or by imputation) of an employee's tortious conduct.[2] If, as the earlier panel **\*1278** decision plainly held, USX was not vicariously liable in respondeat superior for Bryan's conduct, it was no more liable on that theory after than before the employer came to know of the conduct. Nothing in the earlier panel decision suggests anything to the contrary. That decision left open only the possibility that USX might be found directly, not vicariously, liable for its own negligent failure to supervise Bryan *after* knowledge of his earlier depredations were imputed to it through Stoutz. The district court was prepared faithfully to allow Davis to attempt proof under that theory, and ultimately did allow the effort that was then aborted by Davis' concession of inability to make the required proof.

The district court, in my opinion, correctly assessed the situation at the time Davis sought dismissal without prejudice. At that point, Davis had, as a matter of the law of the case, lost as to *any* claim based upon a respondeat superior theory of USX's vicarious liability for Bryan's tortious conduct. Over Judge Butzner's dissent, this court had earlier held that Bryan's intentional conduct, without regard to when it occurred, was not in furtherance of USX's business. If that holding proceeded to incorporation in a final judgment in the district court, as it surely was then proceeding, it would be transformed from mere "law of the case" to res judicata. What Davis

sought, therefore, to USX's considerable prejudice, was freedom from that inexorably approaching consequence. Dismissal without prejudice under Fed.R.Civ.P. 41(a) (1), of course, specifically avoids that consequence. The district court in my judgment was well within its discretion in refusing to grant this great indulgence to Davis at USX's expense.

The district court's action, which I would affirm, may seem to reach a harsh result, smacking somewhat unduly of "technicality." But when the matter is put in perspective that simply is not a proper view of things.

This claimant, with a choice of state and federal forums to prosecute her state claims against USX, deliberately chose the federal forum, and sought there to prosecute her claims through to final judgment. This carried the inevitable risk of defeat on the merits, with full res judicata effect. It also deliberately invoked the federal forum as the chosen one to apply state law to the state common law claims, thereby risking defeat by a federal misunderstanding or misapplication of state law. As matters developed, the claimant, having lost on the merits on the state law claims in district court, decided for purely tactical reasons to abandon her federal Title VII claim. That was a perfectly viable claim, assuming, as seemed quite likely, that Davis could substantially prove her allegations about Bryan's conduct. *See Meritor Savings Bank, FSB v. Vinson,* --- U.S. ----; 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Katz v. Dole,* 709 F.2d 251 (4th Cir.1983). This tactical decision by Davis may be quite understandable from the standpoint of the remedies available under Title VII in relation to those available under the state law claims and in light of the desire to concentrate on reaching an expeditious decision on the latter. It nevertheless was a decision made by claimant, not by the federal court to which she had brought that probably winning federal claim. Its result was to leave only the state law claims before the federal courts. On appeal, the district court's rejection of the state respondeat superior claim was affirmed by this court which nevertheless, though erroneously in my view, *see* 779 F.2d at 214-15 (Phillips, J., concurring and dissenting), found in the record a viable alternative claim of "negligent supervision" directly against USX. **\*1279** So matters stood on remand when Davis asked in effect to be allowed to relitigate the failed respondeat superior claims belatedly in the state forum.

Under these circumstances, the district court quite properly concentrated mainly upon the unfairness threatened to USX by allowing unburdened discontinuance. At that point this was not a case in which, because matters had not proceeded to decision on the merits, nothing more was involved than honoring a preference for another court, "just as good," as the one from which unburdened dismissal was sought. *Cf. Young v. Southern Pacific Co.*, 25 F.2d 630, 632 (2d Cir.1928) (L. Hand, concurring). Much more prejudice was threatened for USX than the mere "prospect of a subsequent lawsuit." *Cf. McCants v. Ford Motor Co.*, 781 F.2d 855, 857 (11th Cir.1986). What was threatened, indeed what inevitably was to occur, was the loss of a favorable determination fairly obtained in a trial court and affirmed on appeal.

It may be thought that the end result-relegation of the state respondeat superior claim (albeit in temporally truncated form) to state court for unburdened resolution-is so just a result for reasons of comity that it should be compelled. Davis suggests, and the majority seems to accept the possibility, see op. p. 1273, that a recent South Carolina

decision, *Crittenden v. Thompson-Walker Co.*, 288 S.Ct. 112, 341 S.E.2d 385 (App.1986), may have drawn in question our earlier panel decision's reliance upon *Rabon* as authority for South Carolina respondeat superior law in the circumstances of this case. Be that as it may, and to me *Crittenden* is easily distinguishable in its facts from both this case and *Rabon*, it bears repeating that Davis deliberately chose the federal courts as arbiters of her state law respondeat superior claim, hence as chosen "finders" of state law on that issue.

I do not think that the district court in these circumstances was bound to treat the adverse federal determination as no more than a limited-risk test run by Davis. This is the result effectively compelled by the finding of an abuse of discretion here.

**All Citations**

819 F.2d 1270, 43 Fair Empl.Prac.Cas. (BNA) 1685, 43 Empl. Prac. Dec. P 37,163, 8 Fed.R.Serv.3d 74, 2 IER Cases 1774

Footnotes
1    Davis, a resident of South Carolina, could not pursue her state law claims against Bryan in federal court because Bryan is also a resident of South Carolina and complete diversity would therefore not exist in an action against both USX and Bryan.
2    The dissent maintains that our previous decision in this case held that USX was not vicariously liable in respondeat superior under South Carolina law for Bryan's conduct after the date that Stoutz became aware of that conduct. We deem this a misreading of what was said. As we have stated, we did not intend for references to the theory of negligent supervision or respondeat superior in that decision to resolve the nature of USX's vicarious liability under South Carolina law. But, contrary to the dissent's contention, our holding in the previous decision did state that the plaintiff might recover under state law under a theory of respondeat superior:
     A majority of the panel has concluded from the factual background here presented that Davis could present a case permitting the fact-finder to establish, under the doctrine of *respondeat superior*, that the observations and inaction of United States Steel's supervisory employee, Stoutz, should be imputed to the company.
     779 F.2d at 211. Judge Butzner, concurring in this portion of the court's opinion, also stated his view that the plaintiff should be allowed to pursue her claims under a theory of respondeat superior. *Id.* at 213 (Butzner, J., concurring and dissenting). In fact, the only suggestion that the decision limited the plaintiff's cause of action to one for negligent supervision may be found in Judge Phillips' dissent to this part of the court's holding. *Id.* at 215.
3    The dissent also argues, without reference to any authority, that the doctrine of respondeat superior does not allow liability to be imputed to an employer because of the employer's knowledge of his employee's forbidden acts. "This very mechanical solution [to determining the scope of employer liability] has been losing ground in recent years" in favor of an approach which recognizes that foreseeability is the critical factor in determining whether an employee's actions were within the scope of his employment. Prosser, Law of Torts § 70 (1971). *Accord:* 53 Am.Jur.2d *Master and Servant* § 434 (1970); *Carroll v. Beard-Laney, Inc.*, 207 S.C. 339, 343, 35 S.E.2d 425, 426 (1945). Thus, while the issue is an open one under South Carolina law, it would be perfectly reasonable for the courts of that state to determine that liability for Bryan's actions should be imputed to his employer after the date that these actions were foreseeable by USX as a result of its supervisor's observation of those actions.

**Davis v. USX Corp., 819 F.2d 1270 (1987)**

43 Fair Empl.Prac.Cas. (BNA) 1685, 43 Empl. Prac. Dec. P 37,163, 8 Fed.R.Serv.3d 74...

4     Other courts have reached similar conclusions. In *Bolten v. General Motors Corp.,* 180 F.2d 379 (7 Cir.1950), the Seventh Circuit overturned the order of the district court denying dismissal on the ground that any prejudice to the defendant could be cured through establishing appropriate terms and conditions for dismissal. The court specifically held that such prejudice did not include the risk that the plaintiff's action would be refiled in a separate jurisdiction in order to escape the bar of the statute of limitations. *Id.* at 382.

      In *Home Owner's Loan Corp. v. Huffman, supra,* the court considered the contention that dismissal without prejudice would deprive the defendant "of its alleged right to freedom from suit in another court upon the same cause of action." The court held that the "defendant does not have such an absolute right under" Rule 41(a)(2). 134 F.2d at 318. Moreover, no prejudice would occur from refiling in state court, the court found, because there was no showing of any unfair disadvantage to the defendant under the laws of Missouri. *Id.*

1     The majority finds this limitation in the portion of Judge Murnaghan's lead opinion quoted in its footnote 2, at op. 1274. With all respect, that passage can properly be read only as referring to the means by which USX, as of the date of Stoutz' knowledge, could be charged with that same knowledge-i.e., by "imputation." "*Respondeat superior*" is only used there as a synonym for, or a means of, "imputation of knowledge." *See* 779 F.2d at 211 ("fact-finder [permitted] to establish under the doctrine of *respondeat superior* that the observations and inaction of ... Stoutz, should be imputed to the company"). Without regard to the precision of this usage, its intended meaning is plain in total context of the lead opinion. That opinion specifically relies upon *Rabon* as supplying the principle of South Carolina law which precluded *any* recovery against USX under *respondeat superior* principles for Bryan's conduct. *See id.* at 211-12. *Rabon* had nothing in it suggesting that the intentional tort exception to vicarious liability depended upon the lack of knowledge of an employer. I so understood the lead opinion at the time, *see id.* at 214 (Phillips, J., concurring and dissenting); I still so understand it; and the district court was absolutely justified in so understanding it.

2     Challenging the accuracy of this general assertion, the majority, op. 1274 n. 3, cites as countervailing authority Prosser, *Law of Torts* § 70 (1971) (at p. 463) and a Prosser-cited South Carolina case, *Carroll v. Beard-Laney, Inc.,* 207 S.C. 339, 35 S.E.2d 425, 426 (1945). With deference, both deal only with the extent to which employer knowledge, hence foreseeability, may operate to restrict the "frolic or detour" spatial limitation on vicarious liability. Neither deals with the related but quite different matter of vicarious liability for intentional torts arguably wholly personal to the employee. As to that, the general principle remains that, even under the most liberal view, vicarious liability arises only with respect to conduct that in part at least is "in furtherance of the employer's business." *Restatement (Second) Agency,* § 235. Foreseeability has been recognized as a factor in such cases only to the extent that the very nature of the job is likely to provoke unauthorized tortious conduct, to be "not unexpectable." *Id.* § 245 comments *a., c., f.* (debt collection, repossession duties, etc.); *cf.* Prosser, *Law of Torts* § 70, pp. 464-67. We specifically recognized in *Rabon* and, by necessity, in this case, that South Carolina might impose liability in a suitable case under this principle. In both cases, however, we found the principle not applicable, as a matter of South Carolina law, to the facts of the cases; specifically, because in neither was the conduct in any way "in furtherance of the employer's business."

---

**End of Document**                     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7

KeyCite Yellow Flag - Negative Treatment
Distinguished by Global Aerospace, Inc. v. Platinum Jet Management,
LLC, S.D.Fla., April 6, 2011

252 F.3d 1253
United States Court of Appeals,
Eleventh Circuit.

Beth B. PONTENBERG, Plaintiff–Appellee,

v.

BOSTON SCIENTIFIC
CORPORATION, Defendant–Appellant.

No. 00–16656
|
Non–Argument Calendar.
|
May 30, 2001.

Recipient of surgical implant brought motion seeking to voluntarily dismiss without prejudice products liability action she had brought against manufacturer of implant. The United States District Court for the Middle District of Florida, No. 99-02516-CV-T-25B, James D. Whittemore, J., granted motion. Manufacturer appealed. The Court of Appeals held that district court did not abuse its discretion by allowing recipient to voluntarily dismiss action without prejudice, even though discovery had expired, and manufacturer's motion for summary judgment was pending.

Affirmed.

West Headnotes (11)

**[1]**     **Federal Civil Procedure**
            👉 Discretion of court

District court enjoys broad discretion in determining whether to allow a voluntary dismissal after defendant has filed an answer or motion for summary judgment. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

44 Cases that cite this headnote

**[2]**     **Federal Civil Procedure**
            👉 Grounds and objections

In most cases, a voluntary dismissal without prejudice should be granted unless the defendant will suffer clear legal prejudice, other then the mere prospect of a subsequent lawsuit, as a result; crucial question to be determined is whether the defendant would lose any substantial right by the dismissal. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

91 Cases that cite this headnote

**[3]**     **Federal Civil Procedure**
            👉 Grounds and objections
            **Federal Civil Procedure**
            👉 Terms and Conditions

In exercising its broad equitable discretion in determining whether to allow a voluntary dismissal after defendant has filed an answer or motion for summary judgment, district court must weigh the relevant equities and do justice between the parties in each case, imposing such costs and attaching such conditions to the dismissal as are deemed appropriate. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

57 Cases that cite this headnote

**[4]**     **Federal Courts**
            👉 Dismissal or nonsuit in general

Court of Appeals reviews a district court's decision to allow a voluntary dismissal without prejudice after defendant has filed an answer or motion for summary judgment only for an abuse of discretion. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

8 Cases that cite this headnote

**[5]**     **Federal Civil Procedure**
            👉 Grounds and objections
            **Federal Civil Procedure**
            👉 Payment of costs and expenses

District court did not abuse its discretion by allowing recipient of surgical implant to voluntarily dismiss her products liability action against implant manufacturer without

**Pontenberg v. Boston Scientific Corp., 252 F.3d 1253 (2001)**

50 Fed.R.Serv.3d 236, 14 Fla. L. Weekly Fed. C 745

prejudice, even though discovery had expired, reports of recipient's expert witness had been excluded due to her attorney's failure to timely comply with expert disclosure requirements, and manufacturer's motion for summary judgment was pending, where recipient's attorney did not act in bad faith, and dismissal was conditioned on payment of costs to manufacturer if action was later refiled. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

15 Cases that cite this headnote

**[6]** **Federal Civil Procedure**
     ⮌ Motion and proceedings thereon
District court need not await a motion from a plaintiff to permit voluntary dismissal after defendant has filed an answer or motion for summary judgment, and may act sua sponte to dismiss. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

5 Cases that cite this headnote

**[7]** **Federal Civil Procedure**
     ⮌ Grounds and objections
**Federal Civil Procedure**
     ⮌ Time for Dismissal; Condition of Cause
Neither the fact that the litigation has proceeded to the summary judgment stage, nor the fact that the plaintiff's attorney has been negligent in prosecuting the case, alone or together, conclusively or per se establishes plain legal prejudice requiring the denial of a motion to voluntarily dismiss action. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

19 Cases that cite this headnote

**[8]** **Federal Civil Procedure**
     ⮌ Time for Dismissal; Condition of Cause
No per se rule exists that the pendency of a summary judgment motion precludes a district court from granting a voluntary dismissal without prejudice; rule governing voluntary dismissals expressly contemplates

situations in which the district court may, in its discretion, dismiss an action without prejudice even after the defendant has moved for summary judgment, and rule also allows the court to prevent prejudice to the defendant in such cases by attaching conditions to the dismissal. Fed.Rules Civ.Proc.Rule 41(a)(2). 28 U.S.C.A.

35 Cases that cite this headnote

**[9]** **Federal Civil Procedure**
     ⮌ Grounds and objections
The mere attempt to avoid an adverse summary judgment ruling in and of itself, particularly where there is no evidence of bad faith, does not constitute plain legal prejudice which will preclude grant of motion to voluntarily dismiss action. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

14 Cases that cite this headnote

**[10]** **Federal Civil Procedure**
      ⮌ Time for Dismissal; Condition of Cause
**Federal Civil Procedure**
      ⮌ Effect
Delay alone, in the absence of bad faith, is insufficient to justify denial of motion for voluntary dismissal without prejudice, and require dismissal with prejudice, even where a fully briefed summary judgment motion is pending. Fed.Rules Civ.Proc.Rule 41(a)(2), 28 U.S.C.A.

20 Cases that cite this headnote

**[11]** **Federal Civil Procedure**
      ⮌ Discretion of court
**Federal Civil Procedure**
      ⮌ Payment of costs and expenses
Where the practical prejudice of expenses incurred in defending the action can be alleviated by the imposition of costs or other conditions, the district court does not abuse its broad equitable discretion by allowing a voluntary dismissal of action without

prejudice. Fed.Rules Civ.Proc.Rule 41(a)(2),
28 U.S.C.A.

15 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1254** Paul L. Weisbecker, Atlanta, GA, Charles D.
Bavol, Tampa, FL, for Defendant–Appellant.

Betsy McCoy Benedict, Betsy McCoy Benedict, P.A.,
Tampa, FL, for Plaintiff–Appellee.

Appeal from the United States District Court for the
Middle District of Florida.

Before ANDERSON, Chief Judge, and DUBINA and
HULL, Circuit Judges.

**Opinion**

PER CURIAM:

Defendant Boston Scientific Corporation ("Boston
Scientific") appeals the district court's order permitting
the plaintiff Beth Pontenberg to dismiss voluntarily her
product liability action. Boston Scientific contends that
the district court abused its discretion in dismissing
the complaint without prejudice because discovery had
expired and Boston Scientific had filed a motion for
summary judgment. After review, we affirm.

### \*1255 I. FACTUAL BACKGROUND

On September 27, 1999, Beth Pontenberg filed this
product liability action against Boston Scientific in a
Florida state court. Boston Scientific is the manufacturer
of a implanted medical device, called a ProteGen sling,
which is designed to treat female urinary incontinence.
This medical device was surgically implanted in
Pontenberg and, according to Pontenberg, subsequently
caused an infection to develop. Pontenberg alleged that
Boston Scientific negligently designed and manufactured
the device, breached its implied warranty of fitness, and
was strictly liable.

Boston Scientific removed the action to federal court
pursuant to 28 U.S.C. §§ 1332 and 1441. On March 15,
2000, the district court entered a case management and
scheduling order, which required the parties to make

Rule 26 expert witness disclosures simultaneously on
September 1, 2000. The district court also designated
October 2, 2000 as the expiration of the discovery period,
imposed a deadline of November 2, 2000 for filing
dispositive motions, and set a trial date of April 30,
2001. On September 1, 2000, Boston Scientific delivered
to Pontenberg an expert witness disclosure that fully
complied with Rule 26. Pontenberg's expert witness
disclosure, on the other hand, was inadequate.

Consequently, on September 13, 2000, Boston Scientific
moved to strike Pontenberg's expert witnesses. The district
court held a hearing on the motion to strike on October
19, 2000, after which it granted the motion and struck
Pontenberg's experts. On November 2, 2000, Boston
Scientific moved for summary judgment, arguing that,
since Pontenberg's expert witnesses had been struck, she
could not establish her prima facie case.

Pontenberg did not respond to the motion. Instead,
on November 27, 2000, she filed a notice of voluntary
dismissal without prejudice. Over Boston Scientific's
objection, the district court entered an order permitting
Pontenberg to dismiss her action without prejudice and
denying as moot Boston Scientific's summary judgment
motion. Boston Scientific appealed.

### II. DISCUSSION

On appeal, Boston Scientific argues that the district court
abused its discretion when it concluded that Boston
Scientific had failed to demonstrate clear legal prejudice
and dismissed Pontenberg's action under Federal Rule of
Civil Procedure 41(a)(2). Rule 41 governs the ability of
a plaintiff to dismiss an action voluntarily and without
prejudice. Rule 41(a)(1) permits a plaintiff to dismiss
voluntarily an action without prejudice *without* first
seeking leave from the court as long as the defendant has
not yet filed either an answer or a motion for summary
judgment, whichever occurs first. Once an answer or a
summary judgment motion has been filed, Rule 41(a)
(2) permits a plaintiff to dismiss voluntarily an action
only "upon order of the court and upon such terms and
conditions as the court deems proper." Fed.R.Civ.P. 41(a)
(2). Such a voluntary dismissal upon order of the court is
also deemed without prejudice unless otherwise specified
by the court.

**Pontenberg v. Boston Scientific Corp., 252 F.3d 1253 (2001)**

50 Fed.R.Serv.3d 236, 14 Fla. L. Weekly Fed. C 745

[1] [2] [3] [4] The district court enjoys broad discretion in determining whether to allow a voluntary dismissal under Rule 41(a)(2). *McCants v. Ford Motor Co., Inc.*, 781 F.2d 855, 857 (11th Cir.1986). "[I]n most cases, a voluntary dismissal should be granted unless the defendant will suffer clear legal prejudice, *other then the mere prospect of a subsequent lawsuit,* as a result." *Id.* at 856–57. "The crucial question to be determined is, Would the defendant lose any substantial right by the dismissal." *1256 *Durham v. Florida East Coast Ry. Co.*, 385 F.2d 366, 368 (5th Cir.1967). In exercising its "broad equitable discretion under Rule 41(a)(2)," the district court must "weigh the relevant equities and do justice between the parties in each case, imposing such costs and attaching such conditions to the dismissal as are deemed appropriate." *McCants*, 781 F.2d at 857. Accordingly, we review a district court's decision to allow a voluntary dismissal without prejudice under Rule 41(a)(2) only for an abuse of discretion. *Id.*

[5] [6] Pontenberg sought to dismiss her action against Boston Scientific after the discovery period had expired and after her expert reports had been excluded from the record as a result of her attorney's failure to timely comply with the expert disclosure requirements of Rule 26. Boston Scientific objected to a voluntary dismissal without prejudice. Boston Scientific claimed that a dismissal without prejudice was inappropriate at this juncture in the litigation because it had invested considerable resources, financial and otherwise, in defending the action, including by preparing the then pending summary judgment motion. Additionally, Boston Scientific argued that dismissal without prejudice was improper because Pontenberg had failed to diligently prosecute the action. [1]

The district court found that Boston Scientific had failed to identify "clear legal prejudice" and granted Pontenberg's request. Although the district court found dismissal appropriate, it ordered that the court "should assess costs against Plaintiff pursuant to Fed.R.Civ.P. 41(d)" if Pontenberg re-files her action against Boston Scientific. [2]

[7] We find that the district court did not abuse its broad discretion in allowing Pontenberg to dismiss voluntarily her action against Boston Scientific without prejudice under Rule 41(a)(2). Neither the fact that the litigation has proceeded to the summary judgment stage nor the fact that the plaintiff's attorney has been negligent in

prosecuting the case, alone or together, conclusively or per se establishes plain legal prejudice requiring the denial of a motion to dismiss. *See Durham v. Florida East Coast Ry. Co.*, 385 F.2d 366 (5th Cir.1967).

In *Durham v. Florida East Coast Railway Co.,* the plaintiff filed suit under the Federal Employers' Liability Act alleging that the railroad he worked for had been contributorily negligent by failing to provide a safe workplace. When the case was called for trial, however, the plaintiff made an oral motion for leave to amend his complaint to include a claim under the Federal Safety Appliance Act, which permitted recovery without regard to contributory negligence. The plaintiff contended that he had discovered new evidence to support the additional claim. *Id.* at 367. The district court denied the motion, finding that the evidence was not new evidence but information provided by the plaintiff. Following this ruling, counsel for the plaintiff announced that he could not proceed with trial, and the district court dismissed the action with prejudice.

*1257 Our predecessor circuit reversed, holding that the district court had abused its discretion in dismissing the complaint with prejudice. The court recognized that the plaintiff's counsel may have been negligent in failing to discover the evidence sooner, but found it significant that there was no evidence of bad faith on the part of the plaintiff's counsel. *Id.* at 368; *see also McCants v. Ford Motor Co.*, 781 F.2d 855, 858 (11th Cir.1986) (discussing *Durham* and finding no evidence that plaintiff's counsel had acted in bad faith). The court therefore declined to "visit the sins of the lawyer upon his client," and stated that it considered the counsel's negligence "insufficient to justify dismissal of the complaint with prejudice." *Id.* at 367, 368. The court concluded that the "record does not disclose any prejudice to the defendant, had a voluntary dismissal been granted, other then the annoyance of a second litigation upon the same subject matter." *Id.* at 369. The court remanded the action for further proceedings, noting that "[o]n proper motion the complaint may be dismissed without prejudice upon such terms and conditions as the court deems proper." *Id.*

Boston Scientific attempts to distinguish *Durham* by arguing that, unlike in the record in *Durham,* the record here indicates that Pontenberg's counsel acted in bad faith. In support of bad faith, Boston Scientific emphasizes that Pontenberg failed to conduct any timely discovery,

failed to disclose properly expert witnesses, and sought voluntary dismissal only after Boston Scientific had moved for summary judgment and she had failed to respond to the summary judgment motion. Contrary to this argument, the district court found that Pontenberg's counsel had not acted in bad faith in failing to make adequate disclosure.[3] Indeed, it is clear **1258** from the transcript of the hearing on Boston Scientific's motion to strike that the district court attributed Pontenberg's noncompliance with Rule 26 to her attorney's inattention rather than by design. The record in the district court supports this finding.

[8]  [9]  Furthermore, Boston Scientific's assertion of clear legal prejudice lacks merit. We decline to adopt a per se rule that the pendency of a summary judgment motion precludes a district court from granting a Rule 41(a)(2) voluntary dismissal without prejudice. Rule 41(a) expressly contemplates situations in which the district court may, in its discretion, dismiss an action without prejudice even after the defendant has moved for summary judgment. Indeed, a voluntary dismissal by leave of court under Rule 41(a)(2) after a summary judgment motion is filed is deemed to be without prejudice unless otherwise ordered. The rule also allows the court to prevent prejudice to the defendant in such cases by attaching conditions to the dismissal. In addition, it is clear under *McCants v. Ford Motor Co., Inc.*, 781 F.2d 855 (11th Cir.1986), that the mere attempt to avoid an adverse summary judgment ruling in and of itself, particularly where there is no evidence of bad faith, does not constitute plain legal prejudice.[4]

[10]  Boston Scientific acknowledges that the mere pendency of a summary judgment motion, by itself, does not constitute legal prejudice sufficient to support a denial of a Rule 41(a)(2) voluntary dismissal without prejudice. Instead, Boston Scientific relies upon a number of other factors to defeat the voluntary dismissal without prejudice in this case. As support, Boston Scientific cites *Pace v. Southern Express Co.*, 409 F.2d 331 (7th Cir.1969), which lists various factors to be considered by courts in examining a plaintiff's Rule 41(a)(2) motion to dismiss. The *Pace* factors include "the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a **1259** motion for summary judgment has been filed by the defendant."

*Id.* at 334. However, this circuit has never specifically addressed or adopted the *Pace* factors.[5] Under our circuit precedent, delay alone, in the absence of bad faith, is insufficient to justify a dismissal with prejudice, even where a fully briefed summary judgment motion is pending. *See Durham*, 385 F.2d at 368; *McCants*, 781 F.2d at 858.[6]

In this case, the district court rejected outright any notion that Pontenberg was engaged in dilatory tactics. Furthermore, the record indicates that Pontenberg's voluntary dismissal was not sought *solely* to avoid an expected adverse ruling on Boston Scientific's summary judgment motion, but had been contemplated by Pontenberg even before the summary judgment motion had been filed. Indeed, a voluntary dismissal was one of two options suggested by the district court as a possible cure to the dilemma Pontenberg's counsel had created for her client, the other being to file more thorough written motions to extend the various deadlines in the scheduling order and to supplement the Rule 26 disclosure.[7] Furthermore, these options were discussed in open court *prior to* Boston Scientific filing its summary judgment motion, and Boston Scientific raised no objection. Under these circumstances, we cannot say that the district court's decision to permit Pontenberg to dismiss her action without prejudice was outside the zone of choice.

**1260**  [11]  This is particularly true where, as here, the district court has conditioned the dismissal on the payment of costs to the defendant should the plaintiff later refile. Where the "practical prejudice" of expenses incurred in defending the action can be "alleviated by the imposition of costs or other conditions," the district court does not abuse its "broad equitable discretion" by dismissing the action without prejudice. *McCants*, 781 F.2d at 859. Here, the district court attached the condition that, should Pontenberg re-file her action, the court should award costs to Boston Scientific pursuant to Rule 41(d). Therefore, any financial prejudice suffered by Boston Scientific has been adequately addressed.

Accordingly, we conclude that the district court did not abuse its discretion in permitting Pontenberg to dismiss voluntarily without prejudice her products liability action against Boston Scientific.

**AFFIRMED.**

**All Citations**

252 F.3d 1253, 50 Fed.R.Serv.3d 236, 14 Fla. L. Weekly Fed. C 745

## Footnotes

1    Boston Scientific also argued that the district court should deem Pontenberg's notice of dismissal defective because she had failed to file a motion requesting that the court enter an order of dismissal as required by Rule 41(a)(2). The district court did not directly address this argument in its order, but treated Pontenberg's notice of dismissal as a motion. Boston Scientific does not raise this argument on appeal. We note, however, that a district court need not await a motion from a plaintiff to permit voluntary dismissal and may act sua sponte to dismiss under Rule 41(a)(2). *See Kotzen v. Levine,* 678 F.2d 140, 140 n. 3 (11th Cir.1982).

2    Rule 41(d) authorizes the district court to require the plaintiff to pay the defendant's costs of the dismissed action upon refiling the action.

3    Pursuant to the district court's scheduling order, the parties were required to disclose expert witnesses simultaneously on September 1, 2000. On that date, Boston Scientific served Pontenberg's counsel with the names of five expert witnesses and their written reports. Pontenberg's counsel, however, provided only a list of four experts, as well as two additional experts not yet identified, and two resumes. She did not include expert witness reports as required by Rule 26 and stated in the disclosure that she would supplement upon receipt of the reports from the experts and after receiving and reviewing documents from Boston Scientific in response to discovery requests. On September 13, 2000, Boston Scientific filed a motion to strike Pontenberg's experts. In response Pontenberg filed a motion to enlarge the time to supplement her expert disclosure and to complete discovery, which was due to expire on October 2, 2000.

   The district court held a hearing on October 19, 2000 to address these motions. At the hearing, Pontenberg's counsel acknowledged that her expert witness disclosure had been inadequate under Rule 26. By way of explanation, Pontenberg's counsel first stated that both she and her client were having difficulty financially affording expert witnesses. Specifically, counsel informed the court that she had only just completed an evaluation of whether the physicians who performed the surgery on Pontenberg should be joined as parties and sued for medical malpractice, which left little resources for retaining experts in the products liability component of her case. In this regard, Pontenberg's counsel stated that she had been in communication with another attorney in Tampa who was preparing a class action suit against Boston Scientific and that this attorney was going to be adding Pontenberg's case to this action to help defray expenses and get the litigation moving. Counsel also admitted that she had been involved in a race for office in the state legislature and that, at the time the disclosures were being prepared, she had improperly "turned it over to [her] associates," and had not properly attended to the case.

   The district court then granted Boston Scientific's motion to strike. However, in doing so, the court declined to find that Pontenberg's counsel had been dilatory or acted in bad faith, as follows:

   It's not our view, and it's not suggested, and I do not conclude that [counsel's failure to make adequate Rule 26 disclosure] is a tactical decision on plaintiff's side. I don't think that's why we're here. We're here because of inaction.

   The district court also advised counsel that she could either file written motions seeking to extend deadlines and to supplement her Rule 26 disclosures or she could dismiss voluntarily and refile the action, as follows:

   I am familiar with the standards for striking witnesses, but we are beyond that point. It seems to me that the plaintiff has two choices. Plaintiff can take a voluntary dismissal, refile this action and do it the way it's supposed to be done, or the plaintiff can file appropriate written motions with candid straightforward statements justifying continuance of [sic] extensions of deadlines and request to supplement witnesses.

   After the district court ruled on this motion, Pontenberg's counsel indicated that she might choose to dismiss the case.

4    In *McCants,* the plaintiff wished to dismiss her diversity product liability action filed in Alabama because she believed that her complaint would be subject to Alabama's general one-year statute of limitations and, therefore, defendants' already-filed motion for summary judgment would be granted. The plaintiff wished to refile her suit in Mississippi, where she believed she would not be time-barred. The district court granted the plaintiff's Rule 41(a)(2) motion and dismissed the action without prejudice. *McCants v. Ford Motor Co.,* 781 F.2d 855, 857 (11th Cir.1986). Relying in part upon *Durham,* this court concluded that the dismissal without prejudice was not an abuse of discretion, but remanded for further consideration of whether costs or conditions should be imposed. *Id.* at 859–60 (rejecting the defendant's argument that the "great costs

it has incurred in defending this suit so far" constitutes plain legal prejudice given that this "practical prejudice" can "be alleviated by the imposition of costs or other conditions upon the dismissal without prejudice").

5    Furthermore, we note that, since *Pace*, the Seventh Circuit has clarified that "the enumeration of factors to be considered in *Pace* is not equivalent to a mandate that each and every factor be resolved in favor of the moving party before dismissal is appropriate. It is rather simply a guide for the trial judge, in whom the discretion ultimately rests. Further, the very concept of discretion presupposes a zone of choice within which the trial court may go either way in granting or denying the motion." *Kovalic v. DEC Int'l, Inc.*, 855 F.2d 471, 474 (7th Cir.1988) (internal quotations, citations, and alterations omitted).

6    Boston Scientific also argues that *Doe v. Urohealth Systems, Inc.*, 216 F.3d 157 (7th Cir.2000) is a factually similar case providing persuasive authority on the issue of whether granting a voluntary dismissal without prejudice despite the presence of an unopposed summary judgment motion would constitute an abuse of discretion. In *Doe*, the plaintiff brought a products liability action and then engaged in abusive and dilatory discovery tactics that resulted in several strongly worded protective orders. After the defendant filed a summary judgment motion and a motion to strike the plaintiff's expert witness, the plaintiff filed a second action in state court and then moved for a Rule 42(a)(2) dismissal of the federal court action. The district court dismissed the action without prejudice. *Doe v. Urohealth Sys., Inc.*, 216 F.3d 157, 159–60 (7th Cir.2000).

Boston Scientific cites language in *Doe* in which the Seventh Circuit states that it is difficult to discern from the record on appeal a justification for dismissing the case. *See id.* at 162–63. However, this language is dicta. *Doe* reversed the district court not because it abused its discretion in granting the Rule 41(a)(2) voluntary dismissal, but because it erred in applying the legal principles of res judicata to find that the defendants would not be prejudiced by a dismissal. *Id.* at 162. In remanding the case to the district court for further proceedings, the court acknowledged that whether legal prejudice exists "depends on the particular circumstances and that a range of factors could be taken into account" and that the district court's determination is entitled to "considerable deference." *Id.* at 163.

7    At the hearing on Boston Scientific's motion to strike, Pontenberg's attorney made it clear that she was in the process of handing the case over to another attorney who was planning to incorporate Pontenberg's claims within a class action suit he was preparing to file and, for this reason, might opt to dismiss the action rather than seek extensions for the deadlines in the scheduling order. In other words, the record suggests that Pontenberg's wish to dismiss the action was motivated at least in part by a wish to join a class action lawsuit.

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8



# Department of Justice

STATEMENT OF

**JASON WEINSTEIN**
**DEPUTY ASSISTANT ATTORNEY GENERAL**
**CRIMINAL DIVISION**

BEFORE THE

**COMMITTEE ON JUDICIARY**
**UNITED STATES SENATE**
**SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW**

ENTITLED

**"PROTECTING MOBILE PRIVACY:**
**YOUR SMARTPHONES, TABLETS, CELL PHONES AND YOUR PRIVACY"**

PRESENTED

**May 10, 2011**

Good afternoon, Chairman Franken, Ranking Member Coburn, and Members of the Committee. Thank you for this opportunity to testify on behalf of the Department of Justice regarding privacy and mobile devices.

Over the last decade, we have witnessed an explosion of mobile computing technology. From laptops and cell phones to tablets and smart phones, Americans are using more mobile computing devices, more extensively, than ever before. We can bank, shop, conduct business, and socialize remotely with our friends and loved ones instantly, almost anywhere. These devices drive new waves of innovation, personal convenience, and professional resources. They also present increasingly tempting targets for identity thieves, cyberstalkers and other criminals.

Last month, one study concluded that 64% of American cell phone users were using smart phones.1 The speed and scale of that growth makes the topic of this hearing particularly timely. As mobile devices penetrate our daily lives, it is appropriate to evaluate the effect that these new devices have on our safety and privacy. We must also ensure that the law provides sufficient resources to investigators and prosecutors who investigate and prevent crimes against Americans who increasingly conduct their lives using this new medium. I thank the committee for giving me the opportunity to address these issues.

**Prosecuting cybercriminals and identity thieves**

One of the Department of Justice's core missions is protecting the privacy of Americans and prosecuting criminals who violate that privacy. Americans today face a wide range of threats to their privacy, including risks from using mobile devices. Foreign and domestic actors of all types, including cyber criminals, routinely and unlawfully access data that most people would regard as highly personal and private. Unlike the government – which must comply with the Constitution and laws of the United States and is accountable to Congress, courts, and ultimately the people – malicious cyber actors do not respect our laws or our privacy. The government has an obligation to prevent, disrupt, and deter such intrusions.

---

1 *March Mobile Mix Report*, Millennial Media, available at http://www.millennialmedia.com/research/mobilemix/.

Every day, criminals hunt for our personal and financial data so that they can use it to commit fraud or sell it to other criminals. The technology revolution has facilitated these activities, making available a wide array of new methods that identity thieves can use to access and exploit the personal information of others. Skilled hackers have perpetrated large-scale data breaches that left hundreds of thousands—and in many cases, tens of millions—of individuals at risk of identity theft. Today's criminals can remotely access the computer systems of government agencies, universities, merchants, financial institutions, credit card companies, and data processors to steal large volumes of personal information—including personal financial information. As Americans accomplish more and more of their day-to-day tasks using smart phones and other mobile devices, criminals will increasingly target these platforms.

The most significant threats are continuing to evolve, and now increasingly include threats to corporate data. A report just released by McAfee and Science Applications International Corporation confirms this trend in cyber crime. According to this report, which was based on a survey of more than 1,000 senior IT decision makers in several countries, "high-end" cyber criminals have shifted from targeting credit cards and other personal data to the intellectual capital of large corporations. This includes extremely valuable trade secrets and product planning documents. These threats come both from outside hackers as well as insiders who gain access to critical information from within companies and government agencies. As entities make their key proprietary information available via mobile platforms, so that users can access it wherever and whenever it is most relevant, criminals and other actors will attack those devices as well.

The kinds of criminals we are up against are organized, international, and profit-driven. For example, in October 2009, nearly 100 people were charged in the U.S. and Egypt as part of an operation known as Phish Phry—one of the largest cyber fraud cases to date and the first joint cyber investigation between Egypt and the United States. Phish Phry was the latest action in what FBI Director Mueller described as a "cyber arms race" where law enforcement must coordinate and collaborate in order to keep up with its cyber adversaries. The defendants in

Operation Phish Phry targeted U.S. banks and victimized hundreds of account holders by stealing their financial information and using it to transfer about $1.5 million to bogus accounts they controlled. More than 50 individuals in California, Nevada, and North Carolina and nearly 50 Egyptian citizens have been charged with crimes including computer fraud, conspiracy to commit bank fraud, money laundering, and aggravated identity theft. Led by the FBI and the United States Attorney's Office for the Central District of California, this investigation required close coordination with state and local law enforcement, the Secret Service, and our Egyptian counterparts. In late March, five more people were convicted of federal charges for their roles in this phishing operation, bringing the total number of convictions to date to 46.

One increasingly common form of online crime involves the surreptitious infection of a computer with code that makes it part of a "botnet" – a collection of compromised computers under the remote command and control of a criminal or foreign adversary. Criminals and other malicious actors can extensively monitor these computers, capturing every keystroke, mouse click, password, credit card number, and e-mail. Unfortunately, because many Americans are using such infected computers, they are suffering from an extensive, pervasive invasion of privacy at the hands of these actors.

Just last month, the Department announced the successful disruption of the Coreflood botnet, an international botnet made up of hundreds of thousands of computers that had been infected by malicious software (often referred to as "malware"). The Coreflood malware allowed criminals to remotely control the infected computers in order to steal private personal and financial information from unsuspecting computer users, including users on corporate computer networks. Through a combination of civil and criminal authorities, including a temporary restraining order, the FBI seized the servers that the criminals used to control the botnet and set up a substitute "command and control" server. The Coreflood malware was programmed to automatically contact the Coreflood command and control servers for instructions on a routine basis; after FBI intervention, those requests were instead routed to the FBI's substitute server. The FBI then replied to bot queries with an "exit" command that put the bots to sleep and stopped them from collecting further private data and causing more harm to hundreds of

4

thousands of unsuspecting users of infected computers in the United States. As I'll discuss later in my testimony, the Department is concerned that as mobile devices become increasingly capable, they will be integrated into such botnets, or used to control them.

**The Department's Organizational Response**

The Department has organized itself to aggressively investigate and prosecute cyber crime wherever it occurs, including in the context of mobile devices and smart phones. Investigating and disrupting cyber crimes and cyber threats is a priority for the United States Attorney community, and the Attorney General's Advisory Committee has a subcommittee dedicated to cybercrime and intellectual property enforcement issues. A nationwide network of 230 Computer Hacking and Intellectual Property (CHIP) Assistant United States Attorneys in our USAOs focuses on these crimes, in coordination with the Criminal Division's Computer Crime and Intellectual Property Section (CCIPS). CCIPS provides core expertise on these issues, prosecutes cutting edge cases and provides litigation assistance to United States Attorneys' Offices. CCIPS also provides resources such as manuals, and trains prosecutors across the country, often in conjunction with Assistant United States Attorneys. Department prosecutors also work closely with our law enforcement partners.

In FY 2008 through FY 2010, United States Attorneys' Offices brought approximately 4,000 identity fraud cases. In addition, many of the large scale fraud cases prosecuted by the Fraud Section of the Department's Criminal Division also included identity fraud conduct.

The Office of International Affairs (OIA) enhances international cooperation efforts by expediting the sharing of critical electronic evidence with foreign law enforcement partners and by marshaling efforts to secure the extradition of international fugitives. The Office of Enforcement Operations guides investigative policy in numerous areas, including approvals for wiretaps and policy relating to use of tracking devices. It is a combination of these resources both in Main Justice and in the United States Attorneys' Offices that enables prosecutors across the country to tackle these complex and demanding cases.

The FBI Cyber Division is addressing the cybercrime threat from mobile devices through the Financial Threat Focus Cell (FTFC) and the Telecommunications Initiative. Through the FTFC the FBI Cyber Division is working with the largest U.S. based Financial Institutions (FIs) to determine the types, dates and level of mobile banking that those FIs are implementing. The FTFC is also working with FI organizations such as the FS-ISAC, BITS Financial Services Roundtable - Remote Channel Fraud Subgroup and the National Cyber-Forensics & Training Alliance's (NCFTA) Telecommunications Initiative. These organizations provide insight to the FBI so that law enforcement is more cognizant of current and future trends in terms of mobile banking product releases, new business alliances (e.g. AT&T, Verizon and Discover Card's recent product) and new mobile banking vendor companies.

In addition to the FI aspect to the mobile banking threat, the FTFC is working with the telecommunications sector through the Telecommunications Initiative (TI). As a part of the TI, the FBI is working with telecommunication organizations such as the Communication Fraud Control Association (CFCA) and the CTIA – The Wireless Association to address mobile banking and other telecommunications fraud matters. Through the relationship between both the FIs and the TIs the FBI has been able to develop fraud matters such as remote call forwarding, phishing fraud matters and telephonic denial of service (TDOS) attacks against high net worth FI customers. The FBI has ongoing relationships with a number of FI and TI partners to help organize the proactive sharing of fraud information to help mitigate or prevent economic loss. Furthermore, the FBI is beginning to share real-time intelligence with its international law enforcement (LE) partners in regards to global mobile threats. Finally, the FBI is proactively working with several anti-virus companies to stay on the forefront of mobile virus attacks and vulnerabilities.

The Department's work, and the work of our law enforcement partners, has helped to deter national and transnational cyber crime. The Verizon 2011 Data Breach Investigations Report, which is a joint study produced by Verizon, the U.S. Secret Service and the Dutch High Tech Crime Unit, found that more cyber crime investigations were conducted in 2010 than in any previous year, and concluded that the successful prosecution of identity thieves and other

cybercriminals was having a significant impact. The report's leading hypothesis, in fact, was that "the successful identification, prosecution, and incarceration of the perpetrators of many of the largest breaches in recent history is having a positive effect."

**Cyber crime in the mobile context**

As mobile devices become more prevalent, identity thieves and other cybercriminals will begin to target the users of these devices. In fact, this may already be happening. In March, it was widely reported by technology researchers and journalists in the Washington Post, the New York Times, and elsewhere, that more than 50 apps for the Android mobile operating system had been modified to invade user privacy. According to the reports, these modified apps, infected by malware dubbed "Droid Dream," secretly installed malicious code on the device in addition to their apparent functions. This secret malware enabled the apps to steal sensitive information from the device, receive instructions from the criminals who had made the initial modifications, and even update their malicious capabilities. This activity is an example of the migration of criminal malware attacks that have targeted personal computers for years to targeting smart phones and mobile devices. As cell phones functionality expands, the line between mobile devices and personal computers becomes thinner. For criminals, this raises the prospect of millions of new sources of valuable personal and financial data, and millions of new devices to infect with malware and transform into "bots."

For acts that are particularly egregious – such as blatant theft of financial information or the malicious installation of malware I just described – criminal liability seems both appropriate and warranted. The Department of Justice has extensive experience with investigating and successfully prosecuting criminals who distribute malware and profit from their operation. It is the policy of the Department not to comment on ongoing criminal investigations, but criminal prosecution may be the most appropriate response to deter acts of this type and severity.

When deciding whether to bring an indictment under the Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA"), Department prosecutors consider a wide range of factors, including the particular facts of the case, the law of the applicable circuit, the severity of the conduct, and the needs of justice. As mobile devices and services offered to mobile device users continue to expand, it will be important to distinguish between those cases that warrant criminal prosecution and those that may be best resolved through regulatory action. For certain less egregious actions, civil enforcement by the Federal Trade Commission might be more appropriate than criminal prosecution.

In addition to collection, it is also important to consider communications providers' ability to disclose the data that they collect from their customers. In this regard, it is important to note that under current law, communications providers may voluntarily disclose or sell any non-content data – such as information about a user's location – for any reason without restriction to anyone other than state, local, and federal government agencies. The Electronic Communications Privacy Act (ECPA) provides a broad exception for covered providers to disclose appropriately collected customer information to "any person other than a governmental entity." 18 U.S.C. § 2702(c)(6). This exception was included in ECPA at a time when there was great concern over ensuring the flexible development of the then-nascent Internet industry. As the commercial landscape changes, it will be important to ensure that our laws strike the appropriate balance and adequately protect consumers' privacy.

**Cyberstalking**

One important consequence of the proliferation of mobile devices and services that collect location and other personal information about their users is the risk that stalkers, abusive spouses, and others intent on victimizing the user could use information from their mobile device to determine their whereabouts and activities. Stalking is not a new crime, and it is one that the Department of Justice takes very seriously. The increase in the use of mobile devices, however, raises new challenges that must be confronted.

8

The Department's Office on Violence Against Women (OVW) funds a number of projects that target the intersection of technology and the crimes of stalking, sexual assault, domestic violence, and dating violence. The Office recognizes that stalkers are increasingly misusing a variety of telephone, surveillance, and computer technologies to harass, terrify, intimidate, and monitor their victims, including former and current intimate partners. Perpetrators are also misusing technology to stalk before, during, and after perpetrating sexual violence. For young victims in particular, new technologies bring the risk of digital abuses such as unwanted and repeated texts, breaking into personal email accounts, and pressure for private pictures. Three OVW-funded projects, in particular, focus on "high-tech" stalking and the dangers that new technologies pose for victims.

First, for over ten years, OVW has funded the Stalking Resource Center, a program of the National Center for Victims of Crime, to provide training and technical assistance to OVW grantees and others on developing an effective response to the crime of stalking. The Stalking Resource Center has trained over 40,000 multi-disciplinary professionals nationwide, with an emphasis on the use of technology to stalk. Among other projects, the Resource Center has co-hosted nine national conferences that specifically focused on the use of technology in intimate partner stalking cases. In addition, with funding from the Department's Office for Victims of Crime, the Stalking Resource Center is currently developing two new training tools designed to help law enforcement officers, victim advocates, and allied professionals understand the most common forms of technology used by stalkers.

Second, since 2007, OVW has supported the National Network to End Domestic Violence's Safety Net Project, which works to identify best practices for using technology to assist victims. It is also concerned with training victim service providers to understand how stalkers may misuse technology and what strategies victims can use to increase their safety. In the past three years, the Safety Net Project has trained over 10,000 professionals and provided over 2,200 technical assistance consultations to OVW grantees and others.

Third, OVW funds the Family Violence Prevention Fund's "That's Not Cool" campaign to assist teens in understanding, recognizing and responding to teen dating violence. A critical part of this project is to help teens define their "digital line" as it relates to relationship and dating abuse. The website www.thatsnotcool.com was launched in January 2009 to help teens identify digital dating abuse and to encourage them to define for themselves what is and is not appropriate.  So far the campaign has produced strong results, including over 900,000 website visits and 47,400 Facebook fans.

The Department has also strongly responded to the cyberstalking challenge through the prosecution of violations of the federal cyberstalking prohibition, 18 U.S.C. § 2261A. This statute allows for the prosecution of individuals who stalk using "the mail, any interactive computer service, or any facility of interstate or foreign commerce." This encompasses the use of the Internet through computers, smart phones and other mobile devices. Cases have been prosecuted under this statute based on conduct involving MySpace, Facebook and other social networking sites.

In one example of an egregious case charged under this statute, a defendant, posing as the victim, and using the victim's real name and address, posted photographs of the victim's children on a pornographic web site. Many men responded to this invitation.

The federal prohibition, however, is limited by the statutory requirement that the stalker and the victim be in different states, a requirement not found in other threatening statutes. This additional requirement may prevent prosecutors from charging cases, even where the conduct includes the most egregious acts. If an abusive spouse uses his spouse's phone to determine when she visits law enforcement for assistance, or to find where she is when she takes refuge with a friend, this may not violate 18 U.S.C. § 2261A as currently drafted because the two live in the same state. Similarly, a stalker from a victim's home town could potentially use location data from her phone to track her without violating the cyberstalking prohibition for the same reason. In fact, the case described in the previous paragraph was chargeable under 18 U.S.C. § 2261A only because the stalker and the victim, who met on the Internet, lived in different states.  The

Department is considering ways to address this limitation and looks forward to working with Congress on this issue. I hope that this Committee and Congress will take the necessary steps to ensure that law enforcement can continue to protect victims of cyberstalking, and deter their tormenters.

**Investigative resources for prosecuting computer crimes**

Investigating and prosecuting multi-actor, multi-national crimes is extremely resource intensive. It is expensive to train and equip investigators and prosecutors to address the threat of cyber crime. As the proliferation of mobile devices provides criminals with new targets, the task of law enforcement will only get more demanding. Ensuring that law enforcement has the resources it needs to prosecute these crimes is a vital component to ensuring the safety and privacy of Americans.

For more specific details of the Department of Justice's needs for the coming year, I would direct you to the President's 2012 proposed budget, which outlines our detailed requests. In particular, the budget includes a request for funding for the Department to establish six Department of Justice Attaché positions that would emphasize the investigation and prosecution of laws prohibiting international computer hacking and protecting intellectual property rights at embassies around the world. Because computer crime is so often transnational in nature, it is vital that the Department have strong overseas representation to ensure that we can work more quickly and effectively with our international partners when investigating and prosecuting international computer crimes that target American citizens. The program would establish Department representatives at hotspots for computer and intellectual property crime around the world, and would help ensure that we can continue to protect American citizens' privacy, both at home and abroad. I hope that Congress will provide the resources that we need to establish this program and expand our resources to fight international computer crime.

**Enhancing Criminal Investigations and Prosecutions**

      In addition to the resource demands of combating cyber crime, law enforcement must have the authority to collect electronic evidence to investigate privacy invasions and protect public safety. One key statute that addresses this need, while also ensuring a fundamental balance between privacy and public safety, is the Electronic Communications Privacy Act. ECPA empowers law enforcement to collect the evidence it needs to prosecute a wide range of crimes. Department of Justice attorneys regularly use ECPA to obtain crucial evidence from mobile devices for all manner of investigations, including terrorism, drug trafficking, violent crime, kidnappings, computer hacking, sexual exploitation of children, organized crime, gangs, and white collar offenses. But it is important to understand that it plays a central role in the investigation of criminal invasions of privacy as well. When considering how best to protect the privacy of American citizens, I would ask that the Committee remember the important role that law enforcement plays in protecting Americans from privacy threats, and how ECPA is critical to our ability to continue to pursue that role.

      One particular area of concern for the Department in collecting digital evidence – and one which bears directly on this hearing's topic – is ensuring that law enforcement can successfully track criminals who use their smart phones to aid the commission of crimes. When connecting to the Internet, smart phones, like computers, are assigned Internet Protocol (IP) addresses. When a criminal uses a computer to commit crimes, law enforcement may be able, through lawful legal process, to identify the computer or subscriber account based on its IP address. This information is essential to identifying offenders, locating fugitives, thwarting cyber intrusions, protecting children from sexual exploitation and neutralizing terrorist threats – but only if the data is still in existence by the time law enforcement gets there.

      In my recent testimony in January before the House Judiciary Subcommittee on Crime, Terrorism, and Homeland Security, I outlined some of the serious challenges faced by law enforcement in this area in the more traditional computer context. ISPs may choose not to store IP records, may adopt a network architecture that frustrates their ability to track IP assignments and network transactions back to a specific account or device, or may store records for only a

very short period of time. In many cases, these records are the only evidence that allows us to investigate and assign culpability for crimes committed on the Internet. In 2006, forty-nine Attorneys General wrote to Congress to express "grave concern" about "the problem of insufficient data retention policies by Internet Service Providers." They wrote that child exploitation investigations "often tragically dead-end at the door of Internet Service Providers (ISPs) that have deleted information critical to determining a suspect's name and physical location."

In one heart-wrenching example of the harm that a lack of data retention can cause, an undercover investigation that discovered a movie depicting the rape of a two-year-old child that was being traded on the internet was stymied because the ISP that had first transmitted the video had not retained information concerning the transmitter. Despite considerable effort, the child was not rescued and the criminals involved were not apprehended.

These challenges are equally serious in the context of smart phones and mobile devices. As the capabilities of smart phones expand, law enforcement increasingly encounters suspects who use their smart phones as they would a computer. For example, criminals use them to communicate with confederates and take other actions that would ordinarily provide pivotal evidence for criminal investigations. Just as some ISPs may not maintain IP address records, many wireless providers do not retain records that would enable law enforcement to identify a suspect's smart phone based on the IP addresses collected by websites that the suspect visited. When this information is not stored, it may be impossible for law enforcement to collect essential evidence.

In addition to collecting electronic evidence, it is vital to the success of the Department's mission that the scope and definition of criminal offenses is broad enough to allow us to prosecute the wide range of cybercrimes that are developing in today's increasingly networked society. This is particularly the case in the mobile context, where rapidly developing technology and services continue to provide opportunities for criminal acts. Some of the most egregious acts of privacy invasion that may be perpetrated on the users of mobile devices certainly rise to the

level of criminal action under the CFAA. These include the installation of malware, theft of financial and personal information, and similarly severe acts, some examples of which I mentioned earlier. The Department takes these crimes very seriously, and, where criminal prosecution is warranted, is committed to vigorously prosecuting offenders. To date, we have not experienced shortcomings in the CFAA vis-à-vis mobile devices. We are continuing to review these authorities but do not have any particular proposals at this time.

* * *

I appreciate the opportunity to share with you information about some of the challenges the Department sees on the horizon as Americans' use of smart phones and tablets continues to grow, and how the Department works to protect the privacy of users of mobile devices. We look forward to continuing to work with Congress as it considers these important issues.

This concludes my remarks. I would be pleased to answer your questions.

14

# EXHIBIT 9

2009 WL 3297248, 2009 Copr.L.Dec. P 29,839

2009 WL 3297248
United States District Court,
W.D. Wisconsin.

SPACESAVER CORPORATION, Plaintiff,
v.
THE MARVEL GROUP, INC., Defendant.

No. 08–cv–354–slc.
|
Oct. 13, 2009.

West KeySummary

**1**  **Patents**

☞ Awards to competitors

Litigant that voluntarily dismissed its case
rebutted the presumption in favor of granting
the prevailing party its attorney fees and
costs. The prevailing party alleged that it was
entitled to fees because the original patent
infringement claim did not have merit and
even after submitting its valid affirmative
defense the opposing litigant continue to
move slowly and cause more expenses. While
the presumption for the prevailing defendant
was "very strong," fees were inappropriate
because the litigant had dismissed the case
only after the prevailing party had redesigned
the product at issue and after taking time
to analyze the legitimacy of the affirmative
defense offered. The suit had merit as
evidenced by the prevailing party's decision
to redesigning its version of the product and
the prevailing party had cause much of the
expense by failing to assert the affirmative
defense until nine months after the filed
complaint. 17 U.S.C.A. § 505.

Cases that cite this headnote

**Attorneys and Law Firms**

David H. Weber, Thomas Wickham Schmidt, Liebmann,
Conway, Olejniczak & Jerry, S.C., Green Bay, WI, for
Plaintiff.

Eric E. Newman, Jack J. Carriglio, Meckler Bulger Tilson
Marick and Pearson LLP, Jennifer Fitzgerald, Leland
W. Hutchinson, Freeborn & Peters LLP, Chicago, IL,
Theodore J. Long, Lathrop & Clark LLP, Madison, WI,
for Defendant.

Matthew John Kramer, Freeborn & Peters LLP, Chicago,
IL, for Plaintiff and Defendant.

**OPINION and ORDER**

STEPHEN L. CROCKER, United States Magistrate
Judge.

**\*1**  The court of appeals has noted many times that fee
disputes often become a case of the tail wagging the dog.
E.g., *Estate of Enoch ex rel. Enoch v. Tienor*, 570 F.3d
821, 823 (7th Cir.2009); *Assessment Technologies of WI.
LLC v. WIREdata, Inc.*, 361 F.3d 434, 438 (7th Cir.2004);
*Ustrak v. Fairman*, 851 F.2d 983, 987–88 (7th Cir.1988).
Unfortunately, this is another example of such a case. In
briefs more than twice as long as any other filed in this
case, the parties rehash almost every aspect of the case's
history in an attempt to argue for or against defendant
Marvel Group, Inc's motion for attorney fees and non-
taxable costs, dkt. 112.

Plaintiff Spacesaver Corporation brought this suit against
defendant in June 2008, contending that defendant was
making and selling weapon cabinets that infringed two
design patents and a copyright owned by plaintiff. In May
2009, I granted plaintiff's motion to voluntarily dismiss
the case with prejudice. Dkt. 110. Defendant now argues that
it is entitled to attorney fees and non-taxable costs under
17 U.S.C. § 505 (for the copyright claim), 35 U.S.C. § 285
(for the patent claim) and 28 U.S.C. § 1927 (for all claims).
I am denying this motion for the reasons set forth below.

**I. Copyright Act**
Under 17 U.S.C. § 505, a district court "in its discretion"
may award "reasonable attorney fees" to the prevailing
party in a copyright case, whether the prevailing party is
the plaintiff or defendant, *Fogerty v. Fantasy, Inc.*, 510
U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), and
whether the party prevailed on the merits or because the
other party "threw in the towel" by voluntarily dismissing
its claims. *Riviera Distributors, Inc. v. Jones*, 517 F.3d 926,

928 (7th Cir.2008). Although the statute does not include a standard for awarding fees, the court of appeals has held that the prevailing party is entitled to a presumption of a fee award, a presumption that is "very strong" when the prevailing party is the defendant, who is unable to reclaim costs and fees through an award of damages. *Assessment Technologies of WI, LLC v. WIREdata, Inc.,* 361 F.3d 434, 437 (7th Cir.2004).

Because plaintiff "threw in the towel" by voluntarily dismissing its copyright claim, defendant is the prevailing party under § 505. However, this does not mean that defendant is automatically entitled to a fee award. A presumption may be rebutted depending on the facts of a particular case. *Eagle Services Corp. v. H20 Industrial Services, Inc.,* 532 F.3d 620, 625 (7th Cir.2008); *see also Fogerty,* 510 U.S. at 534 n. 19 (listing various factors that may affect decision on attorney fees, including "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance consideration of compensation and deterrence").

In this case, plaintiff's atypical reasons for walking away from this lawsuit show why the ordinary presumption should not be dispositive. In its voluntary dismissal motion, plaintiff pointed primarily to defendant's affirmative defense under 28 U.S.C. § 1498, which plaintiff said "will likely prevent [it] from recovering damages from Marvel for a significant portion of the infringing sales." Dkt. 107. [1] In addition, plaintiff cited defendant's redesign of its cabinets, which defendant performed after plaintiff filed this lawsuit.

*2 Defendant does not seriously challenge plaintiff's stated reasons. It attempts to argue that plaintiff's lawsuit lacked merit even without regard to the § 1498 defense or the redesign, but defendant's previous actions and words are more telling. As a starting point, it is unlikely that a company would undertake the potentially time-consuming and expensive redesign of its product in response to an intellectual property lawsuit unless the infringement allegations had merit. Indeed, in one of the motions for summary judgment that defendant filed before plaintiff moved to dismiss its lawsuit, defendant admitted that it "redesigned its original product to further avoid" plaintiff's protected designs. Dkt. 96, at 1. Defendant did not even bother to raise an argument regarding infringement as it related to defendant's original

cabinets. Although defendant filed two motions for summary judgment, one focused entirely on its affirmative defense under § 1498 and the other was a motion for partial summary judgment related only to the redesigned cabinet. *See* dkts. 91 & 96.

If there were any doubt regarding the merit of plaintiff's claim, one need only compare plaintiff's copyrighted design with defendant's design:

 

Spacesaver's copyright          Marvel weapons cabinet

These designs are very similar, almost indistinguishable. Defendant cannot argue plausibly that plaintiff's original infringement contentions were weak.

In light of this conclusion, the question is whether plaintiff acted reasonably in responding to defendant's redesign of its cabinets and its assertion of an affirmative defense under § 1498. Because I conclude that defendant's own conduct was primarily responsible for the delay in resolving this case, an award under § 505 would be inappropriate.

Plaintiff became aware of defendant's redesign in November 2008; defendant's affirmative defense under § 1498 did not become part of the case until defendant filed its second amended answer on March 27, 2009. Dkt. 89. Thus, there is no basis for defendant to claim that it is entitled to fees or costs that it incurred before November 2008. Before that time, plaintiff had no reason to believe that its claims would be dismissed or even limited. Defendant suggests that plaintiff should have anticipated a defense under § 1498, but this argument is meritless in light of defendant's own failure to realize that it had such a defense until nine months after plaintiff filed the complaint. In any event, as plaintiff points out, it had no obligation to anticipate affirmative defenses

that defendant might raise. *Davis v. Indiana State Police,* 541 F.3d 760, 763–64 (7th Cir.2008). Even if plaintiff did have such an obligation, defendant has failed to show that plaintiff knew or should have known that defendant's only customer was the United States government.

Defendant's position is only a bit more plausible with respect to the time between November 2008 and March 27, 2009. But even assuming that the redesign would have prevented plaintiff from obtaining injunctive relief, plaintiff still would have been entitled to damages for any acts of infringement that occurred while defendant still was making and selling the original cabinets. Thus, plaintiff should not be penalized for maintaining its right to sue before defendant raised its defense under § 1498.

**\*3** The only substantial question under § 505 is whether defendant is entitled to costs and fees that it incurred after March 27, 2009. I cannot conclude as defendant suggests that plaintiff should have dismissed its claims immediately once defendant asserted the § 1498 defense. Before voluntarily walking away from an otherwise viable lawsuit, plaintiff was entitled-and its lawyers almost were obliged- to conduct their own evaluation of the law and the evidence to determine whether and to what extent § 1498 shielded defendant from liability. Defendant has failed to show that the month that elapsed before plaintiff first offered to dismiss the case on April 21, 2009 was an unreasonable amount of time to conduct such an investigation. Although defendant complains that it was forced to bear the expense of two motions for summary judgment that it filed on April 10, these expenses were the direct result of its own failure to raise a § 1498 defense until the eve of summary judgment.

Defendant points out that the April 21 offer of dismissal is somewhat misleading because at that time plaintiff was offering to dismiss the case *without* prejudice, a position that plaintiff does not attempt to defend now. This might have been a ground for awarding partial fees if defendant's own actions had been more reasonable. However, it seems to be undisputed that defendant simply failed to respond to plaintiff's offer. When plaintiff extended a second offer on May 7, 2009, this time to dismiss the case *with* prejudice, defendant's response on May 11 was to demand that plaintiff "dismis [s] with prejudice all pending litigation" (including other cases) and pay defendant $1,200,000, an amount that is more than double defendant's estimate of its fees and non-taxable costs

now.[2] Defendant offers no explanation for ignoring plaintiff's first offer and it does not attempt to justify its almost piratical demands in response to the second offer. Three days later, on May 14, 2009, plaintiff filed a motion with the court to voluntarily dismiss this case, which I granted on May 21, 2009.

On these singular facts and circumstances, I conclude that plaintiff has rebutted the presumption in favor of fees under § 505. To the extent that defendant incurred what it now deems unnecessary costs and fees in this case, the blame lies with defendant's strategy and tactics. There is no reason to foist the cost of defendant's choices onto plaintiff.

**II. Patent Act**

Under 35 U.S.C. § 285, a district court may award attorney fees to the prevailing party in an "exceptional" patent case. Although this standard indicates that an award of fees is a rare event, this has not stopped prevailing parties in this district from seeking fees as a matter of course. But as a point of logic, if every patent lawsuit is exceptional, then none of them is. There must be a more objective standard than the opinion of the attorneys for the winning side.

The statute does not define the meaning of "exceptional," but case law shows that "only a limited universe of circumstances warrant a finding of exceptionality in a patent case: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Wedgetail Ltd. v. Huddleston Deluxe, Inc.,* 576 F.3d 1302, 1304 (Fed.Cir.2009) (internal quotations omitted). Much of defendant's argument under § 285 is the same as its argument under the Copyright Act, which I need not discuss again. Most of the rest relates to alleged discovery abuses by plaintiff.[3] These alleged abuses fall into two categories: (1) using "confidential" documents inappropriately; and (2) "dragging its feet" in complying with discovery requests.

**\*4** With respect to the alleged instances of feet dragging, defendant does not suggest that plaintiff violated any court orders or even that defendant brought these problems to the court's attention, so these alleged deficiencies cannot support a fee award. Breaching a confidentiality agreement could be a more serious issue, but I cannot conclude that defendant's allegations are

sufficient to justify an award under § 285 for several reasons. Again, defendant never raised any issues to the court regarding breaches in confidentiality before bringing this motion, which distinguishes this case from *Frazier v. Layne Christensen Co.*, No. 04–C–315–C, 2005 WL 372253 (W.D.Wis. Feb.11, 2005), a case defendant cites in which I granted a party's motion to enforce a protective order and sanctioned the offending party by directing it to a pay $4000 to the clerk of court.

Second, defendant fails to provide specifics about the alleged violations. It says only that plaintiff gave confidential documents to one fact witness and one expert without first obtaining an undertaking from that witness or providing proper notice to defendant. However, without a description of these documents, it is impossible to determine the nature of the alleged violation or even whether the documents were appropriately classified as confidential Notably, defendant does not suggest that the witnesses should have been prohibited from viewing the documents, only that plaintiff failed to follow the proper procedure for sharing them. Perhaps more importantly, defendant does not identify any prejudice it suffered as a result of plaintiff's procedural deficiencies.

Finally, any discovery violations by plaintiff must be weighed against those of defendant. For example, in its opposition to defendant's motion for attorney fees, plaintiff alleges that defendant failed to comply with court-ordered discovery requests and that it repeatedly ignored requests by plaintiff to take depositions and then failed to make witnesses available for several

more months. Defendant does not seriously deny these allegations. Having refereed similar discovery disputes in dozens of patent lawsuits, I will quell the urge to editorialize and simply observe that there was nothing exceptional about any of this, certainly nothing that would warrant an award of attorney fees to defendant. *See, e.g., Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 07–C–229–C, 2008 WL 4756498, *6 (W.D.Wis. Oct.29, 2008).

### III. 28 U.S.C. § 1927

Like § 285, the application of § 1927 is very limited. It allows a court to award attorney fees against a party "who ... multiplies the proceedings in any case unreasonably and vexatiously." Because defendant raises no new grounds in support of a fee award under this statute, I will deny defendant's request under § 1927 as well.

### ORDER

It is ORDERED that defendant The Marvel Group, Inc.'s motion for attorney fees and non-taxable costs under 17 U.S.C. § 505, 35 U.S.C. § 285 and 28 U.S.C. § 1927, dkt. # 112, is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3297248, 2009 Copr.L.Dec. P 29,839

---

### Footnotes

1    The defense under 28 U.S.C. § 1498 is based on defendant's allegation that all of its allegedly infringing sales were to the U.S. military. Section 1498 prohibits plaintiffs from suing an alleged infringer of a patent or copyright when the alleged infringement involves sales to the federal government; the sole remedy in such a case is to file a claim against the United States in the Court of Claims. The Court of Appeals for the Federal Circuit has held that "section 1498(a) is an affirmative defense rather than a jurisdictional bar." *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1381 (Fed.Cir.2002).

2    Defendant estimates that it incurred $3,000 in non-taxable costs, $23,500 in expert fees and a whopping $470,000 in attorney fees, which itself is a surprisingly high number in light of the relatively simple nature of this case.

3    Defendant also relies on other disputes between the parties before this court and in other forums, but it cites no authority for the proposition that a court may consider conduct outside the instant action in considering a motion under § 285. After all, the question is whether *this* case is "exceptional," not whether there might be grounds for awarding fees in another case. In any event, defendant fails to point to any conduct by plaintiff in other cases that would warrant a fee award in this one.

---

**End of Document**                                         © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   4